UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

DAYVID JIMENEZ,

                                        Plaintiff,

                                                            1:23-cv-00368
            v.                                              (MAD/TWD)

SHERIFF PATRICK A. RUSSO, et al.

                                        Defendants.

_____

APPEARANCES:

DAYVID JIMENEZ
055-769-136
Buffalo Federal Detention Facility
4250 Federal Drive
Batavia, NY 14020
*Plaintiff, Pro Se*

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

### <u>REPORT-RECOMMENDATION AND ORDER</u>

The Clerk has sent to the Court for review a complaint submitted by *pro se* plaintiff

Dayvid Jimenez ("Plaintiff") alleging defendants Sheriff Patrick A. Russo and Under-Sheriff P.J.

Higgiti, Jr., (together "Defendants") violated his civil rights.  (Dkt. No. 1.)  Plaintiff, who is

currently in federal custody at the Buffalo Federal Detention Facility ("BFDF") in Batavia, New

York, has not paid the filing fee for this action and seeks leave to proceed *in forma pauperis*

("IFP application").[1]  (Dkt. No. 3.)  This action is related to *Jimenez v. City of Cohoes*, No. 1:22-

---

[1] By Order entered March 27, 2023, this case was administratively closed with an opportunity to comply with the filing fee requirement.  (Dkt. No. 2.)  Thereafter, Plaintiff filed his IFP application and the inmate authorization form required in this District, and the Clerk reopened the matter and restored it to the Court's active docket.  (Dkt. Nos. 3, 4, 5.)

cv-984 (MAD/TWD) (N.D.N.Y.) ("*Jimenez I*"), familiarity with which is assumed. (Dkt. No. 6.) Notably, on May 22, 2023, Plaintiff's complaint in *Jimenez I* was dismissed with prejudice and judgment was entered the same day. *See Jimenez I*, ECF Dkt. Nos. 24, 25.

## I.      IFP APPLICATION

A court may grant *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1). Upon review, Plaintiff's IFP application demonstrates economic need. (Dkt. No. 3.) He also filed the inmate authorization form required in this District. (Dkt. No. 4.) Accordingly, Plaintiff's IFP application is granted.

## II.     STANDARD OF REVIEW

The court must dismiss an *in forma pauperis* complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.[2] 28 U.S.C. § 1915(e)(2)(B); 28 U.S.C. § 1915A; *see also Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007). The court must also dismiss a complaint if the court lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they suggest." *Triestman v. Fed. Bureau of Prisons*,

---

[2] "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). "A claim is based on an indisputably meritless legal theory when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint." *Id.*

470 F.3d 471, 474 (2d Cir. 2006).[3]  But the "special solicitude" in *pro se* cases, has its limits – to

state a claim, *pro se* pleadings still must comply with Rule 8 of the Federal Rules of Civil

Procedure, which requires a complaint to make a short and plain statement showing that the

pleader is entitled to relief.  *Id*. at 475; Fed. R. Civ. P. 8(a)(2).  This short and plain statement of

the claim must be "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the complaint, the court must accept all well-pleaded factual allegations as

true.  *Id*. at 678-79.  But it does not have to accept as true "[t]hreadbare recitals of the elements

of a cause of action," which are essentially just legal conclusions.  *Twombly*, 550 U.S. at 555.

After separating legal conclusions from well-pleaded factual allegations, the court must

determine whether those facts make it plausible – not merely possible – that the pleader is

entitled to relief.  *Id*.  The statement of the claim must do more than present "an unadorned, the-

defendant-harmed-me accusation."  *Id*.

## III.    BACKGROUND

Plaintiff alleges the following facts.  (Dkt.  No. 1 at 4.[4])  From May 3, 2022, through June

3, 2022, he "was held as a prisoner" by Defendants in the Rensselaer County Correctional

Facility ("RCCF") located in Troy, New York, "pursuant to a[ ] Department of Homeland

---

[3]  Unless otherwise indicated, in quoting cases, all alterations, internal quotation marks,
emphases, footnotes, and citations are omitted.  *See, e.g.*, *Sczepanski v. Saul*, 946 F.3d 152, 157
n.4 (2d Cir. 2020).

[4]  Page references to documents identified by docket number are to the numbers assigned by the
CM/ECF docketing system maintained by the Clerk's Office.  Unless otherwise indicated,
excerpts from the record are reproduced exactly as they appear in the original and errors in
spelling, punctuation, and grammar have not been corrected.

Security ("DHS") Administrative Warrant." *Id*. at 4.  He "was processed as a criminal and became Inmate #44351" and was "imprisoned like the rest of the other people who were there for actually committing crimes." *Id*. at 4.  He wore a "prison uniform," was "labeled" a criminal, and was "treated" and "addressed" as a prisoner. *Id*. at 7.  "And yet, Plaintiff committed no crimes for such punishment." *Id*. at 10.  Instead, he was "placed in prison as a prisoner solely for immigration purposes." *Id*. at 20.

Plaintiff claims Defendants "authorized or granted permission for [DHS] to detain [him] in 'their' facility without having committed a crime.  For that, [D]efendants are liable for [P]laintiff's constitutional rights violations." *Id*. at 20.  The complaint references the Fourth, Fifth, Eighth, and Fourteenth Amendments. *Id*. at 22.  As relief, Plaintiff seeks compensatory damages in the amount of $600,000.00 for each day incarcerated in the RCCF, along with injunctive and declaratory relief. *Id*. at 25.  For a complete statement, reference is made to the complaint.

Additionally, and without permission from the Court, Plaintiff filed a letter motion and a "first supplement" to the complaint.[5]  (Dkt. Nos. 7, 8.)  Plaintiff states, *inter alia*, "I am a detainee in [Immigration and Customs Enforcement ("ICE")] custody since May 3rd, 2022[,] after the City of Cohoes Police Department unlawfully arrested me in pursuant to a Administrative Warrant issued by DHS/ICE.  I was then transported to [RCCF] after being processed by [DHS].  Sheriff Patrick A. Russo, chose to keep me detained without committing

---

[5]  The Court has reviewed both documents.  Moving forward, Plaintiff should refrain from filing documents in multiple cases (*see* Dkt. No. 7; *Jimenez I*, ECF Dkt. No. 21), and Plaintiff is advised that he may not attempt to amend his pleadings in a piecemeal manner.  *See* L.R. 15.1.  Further, inasmuch as Plaintiff's letter motion (Dkt. No. 7) requesting the Clerk to "remove or withdraw the Stay of Removal" that was filed in *Jimenez I*, which is now closed, the Court recommends that the Clerk be directed to terminate the duplicate letter motion filed in this action.

an offense or crime which that turned into a false arrest/false imprisonment." (Dkt. No. 8-1 at

11-2.) *See also Dayvid De Oliveira Jimenez v. Jeffrey Searles*, No. 22-cv-960 (JLS) (W.D.N.Y.)

ECF Dkt. No. 13 (dismissing Plaintiff's *pro se* habeas corpus petition challenging his continued

detention in custody of the DHS at BFDF).[6] Plaintiff remains in the custody of DHS—at the

BFDF in Batavia, New York—pending his removal from the United States. (Dkt. No. 8 at 1-2.)

## IV.    DISCUSSION

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which establishes a cause of

action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution

and laws' of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990). To

state a valid claim under 42 U.S.C. § 1983, a plaintiff must allege that the challenged conduct:

(1) was attributable to a person acting under color of state law; and (2) deprived the plaintiff of a

---

[6] As detailed therein, Dayvid De Oliveira Jimenez (A # 055-769-136) is a citizen of Brazil who
entered the United States as a Lawful Permanent Resident on or about February 15, 2004.
*Dayvid De Oliveira Jimenez v. Jeffrey Searles*, No. 22-cv-960 (JLS) (W.D.N.Y.) ECF Dkt. No.
13 at 1. On March 6, 2018, the Superior Court in Danielson, Connecticut convicted De Oliveira
Jimenez of strangulation in the 2nd degree. *Id.* at 2. The court sentenced him to three years'
imprisonment—suspended—and three years' probation. *Id.* DHS issued an arrest warrant for
De Oliveira Jimenez on April 12, 2022. *Id.* On May 3, 2022, DHS issued a Notice of Custody
Determination to De Oliveira Jimenez ordering that ICE detain him pending a final
administrative hearing. *Id.* On May 11, 2022, DHS served De Oliveira Jimenez with a Notice to
Appear, alleging that he was subject to removal pursuant to § 237(a)(2)(A)(iii) of the
Immigration and Nationality Act ("INA")—as an alien convicted of a crime of violence for
which the term of imprisonment is at least one year—and § 237(a)(2)(E)(i)—as an alien
convicted of a crime of domestic violence. *Id.* DHS issued another Notice of Custody
Determination on June 7, 2022—ordering that ICE continue to detain De Oliveira Jimenez
pending a final administrative determination. *Id.* On August 25, 2022, the Immigration Judge
("IJ") found De Oliveira Jimenez removable and denied his applications for asylum, withholding
of removal, and withholding of removal under the Convention Against Torture. De Oliveria
Jimenez appealed the IJ's decision to the Board of Immigration Appeals ("BIA"), and the BIA
dismissed his appeal on January 25, 2023. *Id.* On February 10, 2023, De Oliveria Jimenez filed
a Petition for Review ("PFR") in the Second Circuit, challenging the BIA's dismissal of his
appeal, and, on February 23, 2023, moved that court for a stay of removal pending adjudication
of his PFR. *Id.* at 3. The Second Circuit has not ruled on that motion for a stay of removal. *See
id.*

right, privilege, or immunity secured by the Constitution or laws of the United States.  *Whalen v. Cty. of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997).  To establish liability under the statute, a plaintiff must plead that each government official defendant violated the Constitution through that official's own individual actions.  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020).  An official may not be held liable for constitutional violations simply because he held a high position of authority.  *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016).

The Court liberally construes Plaintiff's forty-six page complaint and ten-page "first supplement to complaint" as asserting a false imprisonment claim against Defendants.  (Dkt. Nos. 1, 8.)  The remainder of the complaint is a rambling discussion, primarily consisting of legal excerpts, leaving the Court with "an adorned, the-defendant-harmed-me- accusation."  *See Iqbal*, 556 U.S. at 678.  For the reasons that follow, the Court recommends dismissing Plaintiff's complaint with leave to amend.

### A.   Fourth Amendment

Liberally construed, Plaintiff asserts a false imprisonment claim against Defendants.  A Section 1983 claim for false imprisonment is anchored in the Fourth Amendment right 'to be free from unreasonable seizures.'"  *Iverson v. Annucci*, No. 18-CV-0886, 2020 WL 1083152, at *6 (W.D.N.Y. Feb. 28, 2020) (citing *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007)).  For Section 1983 purposes, "false imprisonment is merely a species of false arrest."  *Bowman v. City of Middletown*, 91 F. Supp. 2d 644, 660 (S.D.N.Y. 2000) (citing *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995)).[7]  "In analyzing false imprisonment claims under

---

[7]  "False imprisonment is simply an unlawful detention or confinement brought about by means of an arrest rather than in some other way and is in all other respects synonymous with false arrest."  *Covington v. City of New York*, 171 F.3d 117, 125 (2d Cir. 1999) (Glasser, J., dissenting).  "False arrest and false imprisonment overlap; the former is a species of the latter."  *Wallace v. Kato*, 549 U.S. 384, 388 (2007).

Section 1983, the Second Circuit has generally looked to the law of the state in which the arrest occurred." *Aragon v. New York*, No. 14-CV-9797 (ER), 2017 WL 2703562, at *5 (S.D.N.Y. June 22, 2017) (citing *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006)).

To state a false arrest or false imprisonment claim under New York law, a plaintiff must allege: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged.'" *Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019) (quoting *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016)).  An arrest is privileged if it is based on probable cause. *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest."); *accord Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) ("Probable cause is a complete defense to an action for false arrest."); *Heyliger v. Peters*, 771 F. App'x 96, 97 (2d Cir. 2019) (summary order) (Since "[a]n arrest is privileged if it is supported by probable cause," the existence of probable cause to arrest "is an absolute defense to a false arrest claim.").

Here, Plaintiff alleges he was arrested on May 3, 2022, and detained at the RCCF from May 3, 2022, through June 3, 2022, pursuant to an Administrative Warrant issued by DHS. (Dkt. No. 1 at 3, 41; Dkt. No. 8 at 1-2.)  As such, Plaintiff's Fourth Amendment claim is frivolous because a dispositive defense exits on the face of the complaint.  *See Livingston*, 141 F.3d at 437.

This Court reached a similar result in *Jimenez I*, wherein Plaintiff also complained he was detained at the BFDF in Batavia, New York "as a result of what initiated as a [sic] assumed minor traffic violation . . . that turned into a false arrest/false imprisonment" on May 3, 2022, in

the City of Cohoes.  *Jimenez I*, ECF Dkt. No. 24 (alterations in original).  There, it was inferred from Plaintiff's allegations that the arresting officers learned of his warrant upon checking the information he provided at the scene.  *Id*.  As the District Court explained, "[w]hen an officer learns from a computer database . . . that a person is the subject of an outstanding arrest warrant, probable cause exists to arrest that person."  *Id*.  "Thus, to the extent Plaintiff still contends that his resulting arrest was unlawful, such claim is meritless because the outstanding warrant established probable cause."  *Id*.  The same analysis applies in the case at bar.

As a result, the Court recommends Plaintiff's Fourth Amendment false imprisonment claim against Defendants be dismissed as frivolous and for failure to state a claim upon which relief may be granted.

### B.    Fifth Amendment

The Fifth Amendment Due Process Clause applies only to the federal government, and not to state or municipal governments.  *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002).  Plaintiff has not alleged any federal official violated his Fifth Amendment due process rights.  Therefore, the Court recommends dismissing any Fifth Amendment claims asserted against Defendants for failure to state a claim upon which relief may be granted.

### C.    Eighth Amendment

The Eighth Amendment's prohibition against cruel and unusual punishment prevents the government from treating incarcerated individuals with deliberate indifference.  *Coronet v. Decker*, 449 F. Supp. 3d 274, 282 (S.D.N.Y. 2020) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976)).  Though Plaintiff references the Eighth Amendment, it "does not apply to civil detainees."  *See Coronel v. Decker*, 449 F. Supp. 3d 274, 282 (S.D.N.Y. 2020).  Such individuals "have not been convicted of a crime and thus may not be punished in any manner—neither

cruelly and unusually nor otherwise."  *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).  The

Supreme Court has held, however, that "persons in civil detention deserve at least as much

protection as those who are criminally incarcerated." *Charles*, 925 F.3d at 82 (citing *Youngberg*

*v. Romeo*, 457 U.S. 307, 321–22 (1982).  Thus, for federal civil detainees, those rights are

recognized under the due process clause of the Fifth Amendment or the Fourteenth Amendment.

*Id*.

 For these reasons, the Court recommends dismissing any Eighth Amendment claims

asserted against Defendants for failure to state a claim upon which relief may be granted.

 **D.   Fourteenth Amendment**

 To establish a violation of a right to substantive due process, a plaintiff must demonstrate

the government action was "so egregious, so outrageous, that it may fairly be said to shock the

contemporary conscience."  *City of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).

Additionally, to establish a deliberate indifference claim for unconstitutional conditions of

confinement, a plaintiff must show the official "acted intentionally to impose the alleged

condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition

posed to the [ ] detainee even though the defendant-official knew, or should have known, that the

condition posed an excessive risk to health or safety."  *Vides v. Wolf*, No. 6:20-CV-06293, 2020

WL 3969368, at *10 (W.D.N.Y. July 14, 2020) (quoting *Coronet*, 449 F. Supp. 3d at 284).

 Here, Plaintiff does not raise issues that are customarily resolved by Fourteenth

Amendment due process claims.[8]  Instead, he appears to challenge the fact of his confinement at

---

[8]  For example, *pro se* plaintiffs generally bring Fourteenth Amendment due process claims to
challenge "excessive force," "denial of adequate medical care," "unconstitutional conditions of
confinement unrelated to medical care," and the "failure to protect."  *Randle v. Alexander*, 960 F.
Supp. 2d 457, 470 (S.D.N.Y. 2013).

the RCCF, and not the manner in which he was confined, which the Court addressed above as a part of the Fourth Amendment false imprisonment claim.  In any event, the Court finds the complaint fails to state a claim under the Fourteenth Amendment due process clause.

The complaint also references the Equal Protection Clause of the Fourteenth Amendment, which provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  This provision does not mandate identical treatment for each individual; rather, it requires that "all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985). Plaintiff asserts no facts suggesting Defendants discriminated against him based on his membership in a protected class.  Nor does he allege that Defendants treated other similarly situated inmates who were detained pursuant to a DHS warrant differently than they treated him.  Again, Plaintiff appears to challenge the fact he was detained pursuant to the DHS warrant, which was discussed as part of the Fourth Amendment claim.

For these reasons, the Court recommends dismissing any Fourteenth Amendment claims asserted against Defendants for failure to state a claim upon which relief may be granted.

### E.    Official Capacity Claims

Plaintiff sues Defendants in their official capacities.  (Dkt. No. 1 at 4.)  "Section 1983 claims against municipal employees sued in their official capacity are treated as claims against the municipality itself."  *Ortiz v. Wagstaff*, 523 F. Supp. 3d 347, 361 (W.D.N.Y. 2021).  A municipality cannot be held liable under Section 1983 unless the challenged action was undertaken pursuant to a municipal policy, custom, or practice.  *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).  "Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee."

*Id.*  "*Monell* does not provide a separate cause of action" to a Section 1983 plaintiff.  *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006).  Rather, "it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  *Id.*  Thus, there can be no municipal liability under *Monell* in the absence of an underlying constitutional violation.  *See Morales v. City of New York*, 752 F.3d 234, 238 (2d Cir. 2014) ("[H]aving properly dismissed [plaintiff's] underlying constitutional claims against the individual NYPD defendants, the District Court also properly dismissed his claim against the City and the NYPD for municipal liability under *Monell*.")

Inasmuch as Plaintiff has not pled facts establishing an "underlying constitutional violation," it necessarily follows that he has pled no cognizable claim against Defendants in their official capacities.  *See id.*  As such, the Court recommends dismissal of the complaint against Defendants in their official capacities for failure to state a claim upon which relief may be granted.

### F.     Human Rights

Lastly, the complaint makes a passing reference to the violation of Plaintiff's "Human Rights."  (Dkt. No. 1 at 23.)  Plaintiff does not state the legal basis for this claim and the Court has discerned none.

### G.     Leave to Amend

Generally, a *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999).  An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is

substantive" such that "better pleading will not cure it."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112

(2d Cir. 2000).  Here, Plaintiff clearly takes issue of the fact he was held in the RCCF pursuant to

the DHS administrative warrant.  However, for reason stated herein, even when liberally

construed, the Court finds Plaintiff has failed to state a claim upon which relief may be granted.

Thus, the Court recommends the *sua sponte* dismissal of the complaint in its entirety.

Nevertheless, in deference to Plaintiff's *pro se* status and out of an abundance of caution,

the Court recommends granting Plaintiff leave to amend to cure the deficiencies identified above

to that extent he is able to do so.[9]

## V.   CONCLUSION

For the reasons stated herein, it is hereby

**ORDERED** that Plaintiff's IFP application (Dkt. No. 3) is **GRANTED**;[10] and it is

further

---

[9]  The Court advises Plaintiff that should he be permitted to amend his complaint, any amended
pleading he submits must comply with Rules 8 and 10 of the Federal Rules of Civil Procedure.
In any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims,
including the dates, times, and places of the alleged underlying acts, and each individual who
committed each alleged wrongful act.  Any amended complaint submitted by Plaintiff must set
forth all of the claims he intends to assert against the defendants and must demonstrate that a
case or controversy exists between the Plaintiff and the defendants which Plaintiff has a legal
right to pursue and over which this Court has jurisdiction.  "[C]omplaints relying on the civil
rights statutes are insufficient unless they contain some specific allegations of fact indicating a
deprivation of rights, instead of a litany of general conclusions that shock but have no meaning."
*Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995).  Finally, Plaintiff is informed that any such
amended complaint will replace the existing complaint and must be a wholly integrated and
complete pleading that does not rely upon or incorporate by reference any pleading or document
previously filed with the Court.  *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d
Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original
and renders it of no legal effect.").

[10]  Plaintiff should note that although his IFP application has been granted, he will still be
required to pay fees that he may incur in this action, including copying and/or witness fees.

**RECOMMENDED** that Plaintiff's complaint be **DISMISSED WITH LEAVE TO AMEND**; and it is further

**RECOMMENDED** that the Clerk be directed to terminate Plaintiff's letter motion (Dkt. No. 7), which was originally filed in and pertains to the related case, *Jimenez v. City of Cohoes Police Department et al.*, No. 1:22-cv-00984 (MAD/TWD) (N.D.N.Y.); and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[11]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: June 20, 2023
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[11]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

2020 WL 1083152
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Michael IVERSON, Plaintiff,

v.

Anthony ANNUCCI, et al., Defendants.

18-CV-0886-LJV
|
Signed 02/28/2020

**Attorneys and Law Firms**

Michael Iverson, Buffalo, NY, pro se.

ORDER

LAWRENCE J. VILARDO, UNITED STATES DISTRICT
JUDGE

## INTRODUCTION

**\*1** The *pro se* plaintiff, Michael Iverson, was a prisoner
confined at the Orleans Correctional Facility ("Orleans")
when he filed this action. He asserts claims under 42 U.S.C.
§ 1983 and alleges that he was deprived of his Fourth and
Fourteenth Amendment rights when the defendants arrested
and detained him for violating certain conditions of his parole.
Docket Item 1. He also has moved to proceed *in forma
pauperis* (that is, as a person who should have the prepayment
of the ordinary filing fee waived because he cannot afford it).
Docket Item 2. And he has moved for a preliminary injunction
and a temporary restraining order. Docket Item 3.

Because Iverson meets the statutory requirements of 28
U.S.C. § 1915(a) and has filed the required authorization,
Docket Items 2, this Court grants his motion to proceed
*in forma pauperis*. Therefore, under 28 U.S.C. §§ 1915(e)
(2)(B) and 1915A(a), this Court screens the complaint. For
the reasons that follow, Iverson's motion for a preliminary
injunction and a temporary restraining order is denied, two
of his claims may proceed, but the remaining claim will be
dismissed under sections 1915(e)(2)(B) and 1915A unless he
files an amended complaint correcting the deficiencies noted
below.

## DISCUSSION

Section 1915 "provide[s] an efficient means by which a court
can screen for and dismiss legally insufficient claims." *Abbas
v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (citing *Shakur v.
Selsky*, 391 F.3d 106, 112 (2d Cir. 2004)). The court shall
dismiss a complaint in a civil action in which a prisoner
seeks redress from a governmental entity, or an officer or
employee of a governmental entity, if the court determines
that the action (1) fails to state a claim upon which relief may
be granted or (2) seeks monetary relief against a defendant
who is immune from such relief. *See* 28 U.S.C. § 1915A(b)
(1)-(2). Generally, the court will afford a *pro se* plaintiff an
opportunity to amend or to be heard prior to dismissal "unless
the court can rule out any possibility, however unlikely it
might be, that an amended complaint would succeed in stating
a claim." *Abbas*, 480 F.3d at 639 (citation omitted). But leave
to amend pleadings may be denied when any amendment
would be "futile." *See Cuoco v. Moritsugu*, 222 F.3d 99, 112
(2d Cir. 2000); *see also id.* ("A *pro se* complaint is to be
read liberally. Certainly the court should not dismiss without
granting leave to amend at least once when a liberal reading
of the complaint gives any indication that a valid claim might
be stated." (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d
794, 795 (2d Cir. 1999))).

## I. SCREENING THE COMPLAINT

In evaluating the complaint, the court accepts all factual
allegations as true and draws all inferences in the plaintiff's
favor. *See Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003)
(per curiam); *King v. Simpson*, 189 F.3d 284, 287 (2d Cir.
1999). "Specific facts are not necessary," and the plaintiff
"need only 'give the defendant fair notice of what the ...
claim is and the grounds upon which it rests.' " *Erickson
v. Pardus*, 551 U.S. 89, 93 (2007) (alteration in original)
(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555
(2007)); *see also Boykin v. Keycorp*, 521 F.3d 202, 213 (2d
Cir. 2008) ("[E]ven after *Twombly*, dismissal of a *pro se*
claim as insufficiently pleaded is appropriate only in the most
unsustainable of cases."). Although "a court is obliged to
construe [*pro se*] pleadings liberally, particularly when they
allege civil rights violations," *McEachin v. McGuinnis*, 357
F.3d 197, 200 (2d Cir. 2004), even pleadings submitted *pro
se* must meet the notice requirements of Rule 8 of the Federal
Rules of Civil Procedure, see *Wynder v. McMahon*, 360 F.3d
73, 76 (2d Cir. 2004).

**\*2** Here, a liberal reading of the complaint tells the following story. On March 15, 2013, a New York State Department of Corrections and Community Supervision ("DOCCS") parole officer issued a warrant for Iverson's arrest based on an alleged parole violation ("DOCCS warrant"). Docket Item 1 at 5, 38. DOCCS officials later learned that Iverson was in Guadalupe County, Texas. *Id.* at 5. On January 3, 2016, the "Guadalupe County Sheriff's Department swore out a complaint at DOCCS['s] behest solely upon DOCCS['s] accusation that [Iverson] was an alleged parole violator." *Id.* That same day, in Shertz, Texas, Iverson was "arrested and retaken into DOCCS custody by Texas authorities acting at DOCCS['s] behest." *Id.* at 5-6. On January 4, 2016, Iverson was arraigned at the Guadalupe County Jail and denied bail. *Id.* at 6.

On January 7, 2016, Iverson executed a waiver of extradition in the Guadalupe County District Court. *Id.* at 7. The waiver stated that Iverson

> knowingly and voluntarily, and without promise of reward or leniency, ... waive[d] the issuance and service of the governor's extradition warrant and other legal documents and procedures which otherwise would be required to secure [his] return to the demanding state, and that [he] knowingly and voluntarily consent[ed] to [his] return to that state.

*Id.* at 48. So Iverson apparently was ready to return to New York in connection with his alleged parole violation.

The following day, however, Iverson was "arrested by the U.S. Marshals [*sic*] Service [for violating] 18 U.S.C. § 2250(a)," failure to register as a sex offender. *Id.* at 7. Iverson subsequently was held in the Guadalupe County Jail for eight months before being sentenced in the United States District Court for the Western District of Texas on August 18, 2016, [1] to 37 months of imprisonment and five years of supervised release. *Id.* at 9-10, 50. On August 22, 2016, Iverson was "taken into the United States Marshals [*sic*] [c]ustody and turned over [to] the Bureau of Prisons [c]ustody." *Id.* at 10.

1        The date of Iverson's conviction under 18 U.S.C. § 2250(a) is not clear from the complaint.

Iverson alleges that his eight-month detention at Guadalupe County Jail was based solely on the DOCCS warrant—not the pending federal charges. *Id.* at 10, 12-13. And he claims that this detention violated his due process rights because, under New York law, he should have been informed of the basis of his arrest, given a preliminary hearing within 15 days of his arrest, and given a revocation hearing within 90 days of his arrest. *Id.* at 7-9, 11-17. As a result, Iverson argues, the DOCCS warrant become "void" on April 2, 2016, at the latest, thereby "reinstating [his] original maximum [sentence] expiration date of January 15, 2015." *Id.* at 16. Iverson therefore argues that he was detained in the Guadalupe County Jail at DOCCS's behest "past his New York State [p]rison [s]entence's maximum expiration date" in violation of his constitutional rights. *Id.*

Iverson also claims that he erroneously and unconstitutionally was denied certain opportunities while incarcerated on the basis of the "void" DOCCS warrant. *See id.* at 17-22. Specifically, Iverson learned on February 14, 2018, that he was ineligible for release to a halfway house because on July 24, 2017, Jean Tabor, a DOCCS Parole Officer, and Patrick O'Connor, a Senior DOCCS Parole Officer, had lodged a detainer with the Marion Penitentiary, where Iverson was serving his federal failure-to-register sentence. *Id.* at 17-18, 58. Iverson filed various grievances and wrote to several DOCCS officials arguing that the detainer should be lifted because, for the reasons detailed above, it was "void." *Id.* at 18-22. On April 9, 2018, Iverson received a response letter from Dawn Anderson, Bureau Chief of the DOCCS Niagara Frontier Regional Area Office, stating:

> **\*3** As you are currently incarcerated for another conviction, with a projected release date of 9/9/18, we cannot proceed with the New York State Violation of Release Hearing process until you are available to our warrant only. Upon release from the Federal Penitentiary, you will be returned to New York State for proceedings.

*Id.* at 59. On May 29, 2018, Iverson also received a response letter from Ana Enright, Acting Deputy Commissioner of DOCCS. Enright wrote that Anthony Annucci, Acting Commissioner of DOCCS, "ha[d] asked her to respond to [Iverson's] letter ... [raising] concerns regarding [the DOCCS warrant]." *Id.* Enright informed Iverson that "until [he was] available to [the DOCCS warrant, DOCCS] can't proceed with New York State violation proceedings." *Id.* at 68.

Iverson names Tabor, O'Connor, Anderson, Enright, and Annucci as defendants. He alleges that they violated his Fourteenth Amendment right to due process of law, falsely imprisoned him in violation of the Fourth Amendment, and maliciously prosecuted him in violation of the Fourteenth Amendment. He seeks compensatory and punitive damages. *Id.* at 32.

Iverson also has moved for a preliminary injunction and a temporary restraining order. Docket Item 3. He seeks to enjoin DOCCS from "carrying out an illegal and unlawful policy of detention by continuing to detain parolee[s] after a parole warrant has become void as a matter of clearly established law." *Id.* at 9.

## II. SECTION 1983 CLAIMS

"To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

### A. Official Capacity Claims

Iverson includes a "*Monell*" claim" in his complaint against "DOCCS Officials" for having "an unlawful policy or custom of holding parole warrants in abeyance." Docket Item 1 at 22. He seeks monetary, declaratory, and injunctive relief. *Id.* at 31-32. Because *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), applies only to municipalities, this Court liberally construes these allegations

as suing the named DOCCS supervisory-official defendants in their official capacities.

"The Eleventh Amendment bars suits against states and their officials unless the state consents to suit, Congress abrogates the state's immunity, or the case falls within the *Ex parte Young* exception [for prospective injunctive relief]." *Nat'l Ass'n for Advancement of Colored People v. Merrill*, 939 F.3d 470, 475 (2d Cir. 2019); *see also Ward v. Thomas*, 207 F.3d 114, 119 (2d Cir. 2000) ("[T]he Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law." (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)) (citing *Ex Parte Young*, 209 U.S. 123, 155-56 (1908))). "The line between prospective and retrospective relief is drawn because '[r]emedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law,' whereas 'compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment.' " *Ward*, 207 F.3d at 119 (alteration in original) (quoting *Green*, 474 U.S. at 64). For that same reason, " '[a] declaratory judgment is not available when the result would be a partial end run around' the Eleventh Amendment's bar on retrospective awards of monetary relief." *Id.* at 120 (quoting *Green*, 474 U.S. at 72).

**\*4** The Eleventh Amendment does not, however, bar suits for money damages against state officials in their individual capacities. But to establish liability against a supervisory official under section 1983, a plaintiff must allege that individual's personal involvement in the alleged constitutional violation; it is not enough to assert that the defendant is a "link[ ] in the ... chain of command." *See McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (explaining that the theory of respondeat superior is not available in a section 1983 action). A plaintiff can state a valid section 1983 claim against a supervisory official by alleging that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) *the defendant created a policy or custom under which*

*unconstitutional practices occurred, or allowed the continuance of such a policy or custom*, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.

*Colon*, 58 F.3d at 873 (emphasis added) (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).

"New York has not waived its immunity, nor has Congress abrogated it." *Li v. Lorenzo*, 712 F. App'x 21 (2d Cir. 2017) (summary order) (citing Trotman v. Palisades Interstate Park Comm'n, 557 F.2d 35, 38-40 (2d Cir. 1977); *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990)). Iverson's claims for money damages against the defendants in their official capacities therefore are dismissed with prejudice because any attempt to amend would be "futile." *See Cuoco*, 222 F.3d at 112.

Similarly, Iverson's claim for declaratory relief—specifically, a "declaration that the acts and omissions described [in the complaint] violate[d] [Iverson's] rights"—is denied because "the result would be a partial end run around' the Eleventh Amendment's bar on retrospective awards of monetary relief," *Ward*, 207 F.3d 120 (quoting *Green*, 474 U.S. at 72).

Iverson's claims against DOCCS employees in their official capacities for prospective injunctive relief, however, are not barred by the Eleventh Amendment. Nor are his claims against the employees in their individual capacities. But as explained below, only two of those claims may proceed as pleaded, while the remaining claim must be amended before it may proceed.

**B. Fourteenth Amendment Due Process Claims**

Iverson alleges that the defendants violated his due process rights by not holding a preliminary parole violation hearing within 15 days of his arrest on the DOCCS warrant and a final revocation hearing within 90 days of his arrest on the DOCCS warrant. Docket Item 1 at 11-13. He further alleges that the DOCCS warrant thereby "bec[a]me void," Docket Item 1 at

27, such that his eight-month incarceration, allegedly under that warrant alone, was unconstitutional.

It is well settled that "the constitutional freedom of a parolee generated by statute is a liberty interest protected by the Due Process Clause of the Fourteenth Amendment which may not be terminated absent appropriate due process safeguards." *Moody v. Daggett*, 429 U.S. 78, 85-86 (1976) (citing *Morrissey v. Brewer*, 408 U.S. 471 (1972)). Among the due process rights afforded a parolee is "the right to a hearing at which the court determines two issues: whether the [parolee] violated a condition of [parole] as a matter of fact and, if so, whether this fact warrants revocation." *United States v. Jetter*, 577 F. App'x 5, 7 (2d Cir. 2014) (summary order) (alterations in original) (quoting *United States v. Sanchez*, 225 F.3d 172, 175 (2d Cir. 2000)). Such a hearing must take place "within a reasonable time after [the person] is taken into custody." *Morrissey*, 408 U.S. at 488.

**\*5** "[A] parolee detained in New York for allegedly violating parole is entitled to a preliminary hearing within 15 days of the execution of the parole warrant and to a final revocation hearing within 90 days of the preliminary hearing." *People ex rel. Harris v. Sullivan*, 74 N.Y.2d 305, 308 (1989) (citing N.Y. Exec. Law §§ 259-i(3)(c)(i) and 259-i(3)(f)(i)). "A parolee convicted of committing a new crime while on parole and sentenced to a new definite term, however, need only receive a final revocation hearing." *Id.* (citing N.Y. Executive Law § 259-i(3)(d)). "Failure to conduct a timely preliminary revocation hearing violates the parolee's right to due process unless the [New York State Division of Parole] is able to establish that it could not conduct a hearing because the parolee was beyond its convenience and practical control." *People ex rel. Matthews v. New York State Div. of Parole*, 95 N.Y.2d 640, 643 (2001) (citations omitted).

To the extent Iverson claims that the defendants erred procedurally—either directly or through their unlawful "policy or custom," *Colon*, 58 F.3d at 873—by not holding a timely revocation violation to justify his detention from the time of his arrest under the DOCCS warrant until the time of his conviction under federal law,[2] the claim may proceed. Iverson has plausibly alleged that he remained *solely* in New York custody under the DOCCS warrant after both the 15-day preliminary hearing and the 90-day revocation hearing periods had lapsed. Even assuming that the constitutional limit on holding a revocation hearing is greater than New York State's 90 days, Iverson's allegation that he was held for eight months without a hearing plausibly states a claim that he did

not receive a hearing "within a reasonable time after [he was] taken into custody." *See Morrissey*, 408 U.S. at 488.

2        To the extent Iverson claims that the defendants erred substantively in revoking his parole and ordering him reincarcerated, any such claim would be barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). The Supreme Court has made clear that there is no cause of action under section 1983 for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid." *Heck*, 512 US at 484. "A parolee challenging a parole revocation [under section 1983] must therefore demonstrate that his parole revocation has been 'reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.' " *Opperisano v. P.O. Jones*, 286 F. Supp. 3d 450, 455 (E.D.N.Y. 2018) (citing *Heck*, 512 U.S. at 486-87). In other words, Iverson may seek redress under section 1983 for the period of incarceration between his arrest under the DOCCS warrant and his (a) transfer to federal custody or (b) federal conviction triggering revocation of his state parole. He may not seek redress for the period of incarceration *following* his parole revocation.

To be sure, Iverson alleges that on January 8, 2016, he was "arrested by the U.S. Marshalls [*sic*] Service under 18 U.S.C. § 2250(a)"—a separate charge—and that he subsequently was convicted of, and sentenced to 37 months of imprisonment on, that separate charge. *Id.* at 7. But the mere prosecution of a federal crime does not automatically transfer an inmate into federal custody. *See In re Liberatore*, 574 F.2d 78, 89 (2d Cir. 1978) ("[T]he sovereignty which first arrests the individual acquires the right to prior and exclusive jurisdiction over him, and this plenary jurisdiction is not exhausted until there has been complete compliance with the terms of, and service of any sentence imposed by, the judgment of conviction entered against the individual by the courts of that first sovereignty." (citations omitted)). And Iverson alleges that he was being held in state—not federal—custody.

 *6  At this early stage, the Court will permit Iverson's claim to proceed. DOCCS may, of course, furnish evidence disputing Iverson's allegation that he remained in New York custody—that is, that he was detained only under the DOCCS warrant—after his federal arrest, or that he did not knowingly and voluntarily waive his rights to a

revocation hearing. *See, e.g., id.* ("[P]ursuant to a writ of *habeas corpus ad prosequendum* or ... a writ of *habeas corpus ad testificandum*[,] ... the first sovereignty can ... 'lend' its prisoner to the second sovereignty for trial on charges pending against him there or in order to have him testify in the courts of the second sovereignty." (footnote omitted)); *People ex rel. Smith v. N.Y.S. Bd. of Parole*, 517 N.Y.S.2d 145, 147 (1987) (explaining that the ninety-day statutory period to hold a final parole revocation hearing may be extended when the petitioner "causes or consents to delay or precludes the prompt conduct of such proceedings" (citing N.Y. Exec. Law § 259-i(3)(f)(i))); *see also* 28 C.F.R. § 2.49(f) ("[I]f a parolee requests and receives any postponement or consents to a postponed revocation proceeding[,] ... the above-stated time limits may be extended."). But at this point, accepting, as it must, Iverson's allegations as true, the Court will allow his due process claims to proceed.

**C. Fourth Amendment False Imprisonment and Fourteenth Amendment Malicious Prosecution Claims**
Iverson also alleges that the defendants are liable under section 1983 for false imprisonment and that defendants O'Connor and Tabor are liable for malicious prosecution. *See* Docket Item 1 at 27-31. He argues that "even though his initial confinement was valid on January 3, 2016," he was "unreasonably detained, under the guise of a valid parole warrant, which has become void," Docket Item 1 at 27, and that "DOCCS plans to unlawfully extradite and maliciously prosecute [him] under a parole warrant which is void," *id.* at 31.

A section 1983 claim for false imprisonment is anchored in the Fourth Amendment right "to be free from unreasonable seizures." *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007). "[Courts] look to ... state law principles to determine the validity of [a plaintiff's] federal civil rights claim based on false imprisonment." *Id.* at 204. "Under New York law, the elements of a false imprisonment claim are: '(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.' " *Weyant v. Okst*, 101 F.3d 845, 853 (2d Cir. 1996) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456 (1975)). Iverson has alleged all of these elements, including that the confinement was not otherwise privileged because the DOCCS warrant was invalid. His claim for false imprisonment therefore may proceed.

2020 WL 1083152

"Section 1983 liability [also] may ... be anchored in a claim for malicious prosecution, as this tort 'typically implicates constitutional rights secured by the [F]ourteenth [A]mendment, such as deprivation of liberty.' " *Cook v. Sheldon*, 41 F.3d 73, 79 (2d Cir. 1994) (quoting *Easton v. Sundram*, 947 F.2d 1011, 1017 (2d Cir. 1991)). "[Alt]hough section 1983 provides the federal claim, [courts] borrow the elements of the underlying malicious prosecution tort from state law." *Id.* Under New York law, "[t]he elements of an action for malicious prosecution are (1) the initiation of a proceeding, (2) its *termination favorably to plaintiff*, (3) lack of probable cause, and (4) malice." *Colon*, 60 N.Y.2d at 82 (emphasis added). Iverson has not adequately stated a claim for malicious prosecution because he has not alleged that the proceedings—here, the parole violation charge—terminated in his favor. Nevertheless, and in light of his *pro se* status, Iverson may amend his malicious prosecution claim to include factual allegations showing that his parole revocation has since been found invalid.

### D. Motion for Preliminary Injunction and Temporary Restraining Order

Finally, Iverson has asked this Court to grant a preliminary injunction and a temporary restraining order. Docket Item 3. He seeks to enjoin the defendants from

> **\*7** (1) holding parole warrant[s] in abeyance while a parolee is in custody under the basis of a parole warrant; (2) extending [a] parolee's maximum term[ ] of imprisonment under the basis of parole warrant[s] without affording the [p]arolee with a due process hearing; (3) ... unlawfully detaining parolee[s] under the basis of parole warrant[s] which have become void, due to New York State parole authorities['] failure to effectuate the required procedural safeguards; (4) ... scheduling and holding preliminary parole revocation hearing[s] more than (15) days from the date of the execution of a parole warrant, in clear violation of Executive Law § 259-i(3)(c)(iv); (5) [and] ... extradit[ing

Iverson] under the basis of [the DOCCS warrant].

*Id.* at 1.

"A party seeking a preliminary injunction must demonstrate '(1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief.' " *N.A.A.C.P., Inc. v. Town of East Haven*, 70 F.3d 219, 223 (2d Cir. 1995) (quoting *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir. 1991)).

At this early stage, Iverson has not demonstrated that he is likely to succeed on the merits of his claims. The Court therefore denies his motion for a preliminary injunction and a temporary restraining order.

### CONCLUSION

Because Iverson meets the statutory requirements of 28 U.S.C. § 1915(a) and has filed the required authorization, his request to proceed *in forma pauperis* is granted, But his claim for malicious prosecution will be dismissed under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b) unless he files an amended complaint **within 45 days of the date of this order** that corrects the deficiencies noted above and otherwise complies with Rules 8 and 10 of the Federal Rules of Civil Procedure. Iverson's due process and false imprisonment claims, however, may proceed.

Iverson is advised that an amended complaint is intended to *completely replace* the prior complaint in the action and thus "renders [any prior complaint] of no legal effect." *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). Therefore, any amended complaint must include all allegations against each of the defendants so that the amended complaint stands alone as the only complaint that the defendants must answer in this action.

### ORDER

In light of the above,

**Iverson v. Annucci, Slip Copy (2020)**

2020 WL 1083152

IT IS HEREBY ORDERED that Iverson's request to proceed *in forma pauperis*, Docket Item 2, is GRANTED; and it is further

ORDERED that Iverson's motion for a preliminary injunction and a temporary restraining order, Docket Item 3, is DENIED; and it is further

ORDERED that Iverson may amend his claim for malicious prosecution **within 45 days of the date of this order**; and it is further

ORDERED that the Clerk of Court shall send to Iverson with this order a copy of the original complaint, a blank section 1983 complaint form, and the instructions for preparing an amended complaint; and it is further

ORDERED that if Iverson does not file an amended complaint **within 45 days of the date of this order**, the Clerk of Court shall cause the United States Marshals Service to serve copies of the summons, complaint, and this order upon defendants Tabor, O'Connor, Anderson, Enright, and Annucci, without the plaintiff's payment therefor, unpaid fees to be recoverable if this action terminates by monetary award in the plaintiff's favor; and it is further

ORDERED the Clerk of Court shall forward a copy of this order by email to Michael Russo, Assistant Attorney General in Charge, Buffalo Regional Office <Michael.Russo@ag.ny.gov>; and it is further

**\*8** ORDERED that, under 42 U.S.C. § 1997e(g), the defendants shall answer the complaint; and it is further

ORDERED that Iverson shall notify the Court in writing if his address changes. The Court may dismiss the action if Iverson fails to do so.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 1083152

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Aragon v. New York, Not Reported in Fed. Supp. (2017)

2017 WL 2703562

Case 1:23-cv-00368-MAD-TWD   Document 9   Filed 06/20/23   Page 21 of 37

2017 WL 2703562
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Rodolfo ARAGON, Plaintiff,
v.
State of NEW YORK, City of New York,
Department of Correctional Services, Defendants.

14-CV-9797 (ER)
|
Signed 06/22/2017

**Attorneys and Law Firms**

Rodolfo Aragon, Fishkill, NY, pro se.

Agnetha Elizabeth Jacob, New York City Law Department, New York, NY, for Defendants.

**OPINION AND ORDER**

Edgardo Ramos, U.S.D.J.

 **\*1** Rodolfo Aragon ("Plaintiff"), acting *pro se* and *in forma pauperis*, brings this action against the State of New York ("New York"), the City of New York ("City"), and the Department of Corrections and Correctional Supervision ("DOCCS", and collectively, "Defendants") pursuant to 42 U.S.C. § 1983 ("Section 1983"). Plaintiff alleges that the conditions of his confinement at the Otis Bantum Correctional Center ("Bantum") amount to cruel and unusual punishment in violation of the Eighth Amendment. Plaintiff further claims false imprisonment as a result of an unlawful conviction in state court. The City brings the instant motion to dismiss Plaintiff's Amended Complaint ("Am. Compl.") and Second Amended Complaint ("Sec. Am. Compl.") pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the City's motion to dismiss is hereby GRANTED.

**I. FACTUAL BACKGROUND**[1]

[1]
The following facts, accepted as true for purposes of the instant motion, are based on Plaintiff's allegations in his Complaint ("Compl.") (Doc. 1), Am. Compl. (Doc. 34), Sec. Am. Compl. (Doc. 43), and Plaintiff's Opposition Memorandum to

Defendant's Motion to Dismiss ("Opp. Mem.") (Doc. 48). See *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *Walker v. Schult*, 717 F.3d 119, 122 n. 1 (2d. Cir. 2013) ("[a] district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion.").

Liberally construed, Plaintiff alleges that he was subject to unconstitutional conditions of confinement at Bantum on Rikers Island starting on October 22, 2014. Compl., at 2. Specifically, Plaintiff claims that he was "forced to live in inhumane conditions" due to "insects, ants, roaches, lead poisoning, asbestos, etc." and a "lack of vitamins and food, [and] non-privacy." Am. Compl., at 1. As a result, Plaintiff states he suffers from "external and internal f[u]ngus and [rashes] to body," infections to his lungs and throat as well as mental anguish. Am. Compl., at 1–2.

On October 22, 2014, Plaintiff requested to be moved from Bantum due to these conditions, but was ignored by two prison officials. Compl., Doc. 1-1, at 2. Plaintiff alleges to have requested medical attention on October 22, 2014 due to his exposure to the "inhumane conditions," and claims to have submitted medical grievances on October 23, 2014. Compl., Doc. 1-2, at 1.

In addition, Plaintiff seeks damages based on a false imprisonment claim resulting from an unlawful conviction in state court. Sec. Am. Compl., at 2. Plaintiff claims that he was falsely imprisoned based on "Defendant's guidelines, practices, patterns and procedures," without any further explanation. *Id.*

**II. PROCEDURAL BACKGROUND**
Plaintiff filed the instant action on December 8, 2014 against Jane Doe 1, Jane Doe 2, Bantum, and Rikers Island. Compl. On March 20, 2015, the Court dismissed Plaintiff's claims against Bantum because it is not an entity that can be sued. Doc. 13. The Court instructed the Clerk of the Court to replace Bantum with the City of New York pursuant to Federal Rule of Civil Procedure 21. *Id.*

 **\*2** On August 17, 2015, the Court granted the City's request for an order to show cause on why this action should not be dismissed for want of prosecution pursuant to Federal Rule of Civil Procedure 41(b) based on Plaintiff's failure to keep the Court apprised of his current residence. Doc. 22. After Plaintiff failed to respond to this and two subsequent orders

Aragon v. New York, Not Reported in Fed. Supp. (2017)

2017 WL 2703562

to show cause dated September 4 and October 20, 2015, respectively, Docs. 22–24, the action was dismissed by the Court without prejudice on December 2, 2015. Doc. 25.

Having received a letter from Plaintiff on December 4, 2015 explaining that he had not responded because he had been incarcerated, Doc. 27, the Court vacated the dismissal, requested the Clerk of the Court to reopen the case, and directed Plaintiff to file an Amended Complaint. Doc. 28. On February 22, 2016, Plaintiff filed his Amended Complaint. Doc. 34. On that same day, the Court terminated Plaintiff's claims against Rikers Island, Jane Doe 1, and Jane Doe 2 pursuant to Rule 21.

On March 10, 2016, the Court held an initial conference, during which Plaintiff was granted leave to file a second amended complaint to cure the factual deficiencies in his prior complaints. Doc. 37. The Court provided specific instructions to Plaintiff on the details to be included in the amended pleading. [2] After receiving several extensions of time, *see* Docs. 41–42, Plaintiff filed his Second Amended Complaint on November 15, 2016. On that same day, the Court terminated Plaintiff's claims against the Department of Correctional Services.

[2]     Specifically, the Court advised: "If you were placed in a cell that was subject to infestation, you should indicate precisely what facility you were in; to the extent that you can describe the cell or state which cell you were in, indicate where you were housed; indicate the dates that this happened; indicate who, if anyone, you complained to; indicate what their response was, if any. [...] If there are particular individuals who you say you complained to and who ignored your complaints, you need to indicate who they are because if you only sue the City, then you have a slightly tougher case to make because then you would have to establish that the conditions under which you were housed were part of a practice or policy or custom of the city to keep you and perhaps others in those unsafe conditions." Doc. 37, at 6:16–8:3.

On December 1, 2016, the City filed a motion to dismiss Plaintiff's Amended Complaint and Second Amended Complaint pursuant to Rule 12(b)(6). Docs. 44–45. On January 20, 2017, Plaintiff filed an opposition to Defendant's motion. Opp. Mem. To date, the City has not replied to Plaintiff's opposition memorandum.

## III. LEGAL STANDARD

### A. Rule 12(b)(6) Motion to Dismiss Standard

On a motion to dismiss pursuant to Rule 12(b)(6), the Court is required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). However, the Court is not required to credit legal conclusions, bare assertions or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain enough factual matter to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Accordingly, a plaintiff is required to support its claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570).

### B. *Pro Se* Plaintiff

**\*3**  The same standard applies to motions to dismiss for *pro se* plaintiffs. *See Zapolski v. Fed. Republic of Germany*, 425 Fed.Appx. 5, 6 (2d Cir. 2011). The Court remains obligated to construe a *pro se* complaint liberally, and to interpret a *pro se* plaintiff's claims as raising the strongest arguments that they suggest. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d. Cir. 2006). The obligation to be lenient while reading a *pro se* plaintiff's pleadings "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. N.Y.S. Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). Nevertheless, "*pro se* status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.' " *Triestman*, 470 F.3d at 477 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). To survive a motion to dismiss pursuant to Rule 12(b)(6), a *pro se* plaintiff's pleadings still must contain "more than an unadorned, the defendant-unlawfully-harmed me accusation." *Iqbal*, 566 U.S. at 678. A *pro se* complaint that "tenders naked assertion[s] devoid of further enhancement"

2017 WL 2703562

will not suffice. *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

### C. 42 U.S.C. § 1983

To state a claim under Section 1983, a plaintiff must allege that: (1) defendants were state actors or were acting under color of state law at the time of the alleged wrongful action; and (2) the action deprived plaintiff of a right secured by the Constitution or federal law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). Section 1983 does not create any rights, but merely provides "a procedure for redress for the deprivation of rights [already] established." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted). Accordingly, a civil rights action brought under Section 1983 will stand only insofar as the plaintiff can prove an actual violation of his rights under the Constitution or federal law. *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)).

### IV. DISCUSSION

Liberally construing his pleadings, Plaintiff brings a conditions-of-confinement claim under the Eighth Amendment and a false imprisonment claim against the Defendants. Compl.; Am. Compl.; Sec. Am. Compl.[3] Plaintiff also seeks to impose liability on the City pursuant to Section 1983. Sec. Am. Compl., at 2–3. Plaintiff raises a number of new claims in his opposition to Defendant's motion, including the violation of his constitutional rights under the First, Second, Fifth, Ninth, Fifteenth, Twenty-Fourth and Twenty-Sixth Amendments. Opp. Mem. However, even granting Plaintiff the liberal construction afforded to the submissions of a *pro se* plaintiff, he does not offer any plausible support for such claims. As such, the Court confines its analysis to the conditions-of-confinement claim under the Eighth Amendment, false imprisonment, and the municipal liability.

[3]    Plaintiff has failed to plead the same claims or factual allegations in his amended pleadings as in his earlier complaints. The City acknowledges that Plaintiff appears to treat his amended pleadings as supplements to, not replacements of, his earlier complaints. Doc. 45, at 3. "[I]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture

of important rights because of their lack of legal training." *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983). Accordingly, the Court liberally construes Plaintiff's pleadings by addressing the claims and factual allegations contained in all three of his complaints, regardless of their inconsistency.

### A. Eighth Amendment Claim

**\*4**  Plaintiff alleges that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment due to the "inhumane conditions" of his confinement at Bantum. Am. Compl., at 1; Opp. Mem., at 17. Although the Constitution does not mandate comfortable prison settings, prisoners are entitled to "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989)). Accordingly, prison officials are required to take "reasonable measure[s] to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 620 (2d Cir. 1996). To establish an Eighth Amendment claim based on conditions of confinement, a plaintiff must allege two elements: (1) objectively, that the deprivation the plaintiff suffered was "sufficiently serious" to deny "the minimal civilized measure of life's necessities," and (2) subjectively, that the defendant acted with a "sufficiently culpable state of mind" associated with the "deliberate indifference" to plaintiff's health or safety. *Trammel v. Keane*, 338 F.3d 155, 161 (2d Cir. 2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

### i. Objective Element

To establish the objective element of an Eighth Amendment violation, a plaintiff "must prove that the conditions of his confinement violate contemporary standards of decency." *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (citing *Helling*, 509 U.S. at 35–6). More specifically, a plaintiff must show that the conditions of confinement "pose an unreasonable risk of serious damage" to plaintiff's health or safety. *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). Generally, the "[n]ormal conditions of ... confinement do not constitute an Eighth Amendment violation," but "[s]uch confinement is not abnormal unless it is 'without penological justification, grossly disproportionate, or involving the unnecessary and wanton infliction of pain.' " *Branch v. Goord*, No. 05 Civ. 6495 (WHP), 2006 WL 2807168, at *5

Aragon v. New York, Not Reported in Fed. Supp. (2017)

2017 WL 2703562

(S.D.N.Y. Sept. 28, 2006) (quoting *Smith v. Coughlin*, 784 F.2d 783, 787 (2d Cir. 1984)).

In support of its motion to dismiss, the City argues that Plaintiff has failed to provide sufficient details to determine whether the conditions he was subject to constitute a constitutional deprivation. Doc. 45, at 5. Despite the specific instructions provided by this Court to the Plaintiff on the necessity to include details in his amended pleadings, *see* Doc. 37, Plaintiff submits only scant factual matter to support his claim. Plaintiff solely alleges that he suffered from "inhumane conditions" as a result of "insects, ants, roaches, lead poisoning, [and] asbestos." Am. Compl., at 1. However, courts have recognized that contemporary standards of decency currently allow for some amount of exposure to vermin and asbestos in prison settings. *See Pack v. Artuz*, 348 F. Supp. 2d 63, 32 (S.D.N.Y. 2004) (plaintiff alleging a conditions-of-confinement claim under Section 1983 may be exposed to "low levels of asbestos exposure" "as reflected in the New York State Industrial Code and OSHA regulations"); *Solomon v. Nassau County*, 759 F. Supp. 2d 251, 258 (E.D.N.Y. 2011) ("conditions that are temporary or occasional have been found not to constitute a sufficiently serious deprivation to sustain a Section 1983 deliberate indifference claim"); *Wang v. Vahldieck*, No. 09 Civ. 3783 (ARR), 2012 WL 119591 at *9 (E.D.N.Y. Jan 9, 2012) (temporary exposure to cockroaches in a dirty cell "does not rise to the sort of conduct held repugnant to the conscience of mankind") (internal quotations omitted). Without offering any details to substantiate the extent of the alleged exposure, Plaintiff's bare allegations do not sufficiently demonstrate that the conditions he was exposed to constitute a substantial risk of serious harm necessary to satisfy the objective element of an Eighth Amendment violation. *Pack*, 348 F. Supp. 2d at 84; *see also Farmer*, 511 U.S. at 837. Therefore, Plaintiff's Eighth Amendment claim must be dismissed.

**\*5** Determining that a plaintiff failed to satisfy the objective component of an Eighth Amendment claim, courts may dismiss the claim without passing judgment on the subjective component. *See Martinez v. Schriro*, No. 14 Civ. 3965 (KMW), 2017 WL 87049, at *5 (S.D.N.Y. Jan. 9, 2017) (dismissing plaintiff's Eighth Amendment claim solely based on plaintiff's failure to plead the objective element in his pleadings without analyzing the subjective element).

### B. False Imprisonment Claim

In analyzing false imprisonment claims under Section 1983, the Second Circuit has generally looked to the law of the state

in which the arrest occurred. *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006) (citing *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)). Accordingly, to establish a claim for false imprisonment in New York, a plaintiff must allege: (1) that the defendant intentionally confined plaintiff; (2) that plaintiff was conscious of the confinement and did not consent to it, and (3) that the confinement was not otherwise privileged. *See Jocks v. Tavernier*, 316 F.3d 128, 134–35 (2d Cir. 2003) (quoting *Broughton v. State*, 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310, 314 (N.Y. 1975)).

The Court finds that Plaintiff has failed to satisfy any of the requisite elements to establish a cognizable claim for false imprisonment. Nowhere in his pleadings does Plaintiff substantiate his claim with any factual allegations; he simply states that he was falsely imprisoned. Sec. Am. Compl., at 2. Such a threadbare assertion does not state a plausible claim to relief. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see also Navarra v. Marlborough Gallery, Inc.*, 820 F. Supp. 2d 477, 485 (S.D.N.Y. 2011) (stating that allegations pled upon belief must be accompanied by facts upon which the belief relies).

Furthermore, Plaintiff's false imprisonment claim is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). Doc. 45, at 6. In *Heck*, the Supreme Court held that a complaint must be dismissed if "judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence ... unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." 512 U.S. at 477, 486–7. Thus, to recover damages for a false imprisonment claim under Section 1983, a prisoner must demonstrate that his conviction "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 486–7.

Here, Plaintiff alleges that he was falsely imprisoned and requests relief in the form of his "immediate release/liberty" as well as monetary damages amounting to $9.8 million dollars. Am. Compl., at 1; Sec. Am. Compl., at 2–3. Pursuant to *Heck*, however, he must first demonstrate that said conviction was already invalidated. 512 U.S. at 487. This he fails to do. Therefore, Plaintiff is barred by *Heck* from seeking monetary relief under Section 1983 based on his alleged false imprisonment.

### C. Monell Liability

Aragon v. New York, Not Reported in Fed. Supp. (2017)

2017 WL 2703562

Plaintiff's constitutional claims against the City are brought pursuant to Section 1983. Sec. Am. Compl., at 3. Although a municipality cannot be held liable under Section 1983 solely on a theory of *respondeat superior*, a Section 1983 claim may be brought against a municipality if the alleged unconstitutional action was the result of an official policy, practice or custom. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–692 (1978). The Second Circuit has established a two prong test for Section 1983 claims brought against a municipality. First, the plaintiff must prove " 'the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving [official].' " *Johnson v. City of New York*, No. 06 Civ 09426 (GBD), 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (quoting *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)). Second, the plaintiff must establish a causal connection between the policy or custom and the alleged deprivation of his constitutional rights. *Id.*

**\*6** To satisfy the first prong of the municipal liability test, a plaintiff must allege the existence of at least one of the following elements: (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation; (3) a practice so consistent and widespread that constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees. *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–7 (S.D.N.Y. 2010) (citations omitted).

The Court finds that Plaintiff has failed to meet any of the requisite elements to satisfy the first prong of a municipal liability claim. Plaintiff submits no allegations to indicate the existence of either a formally recognized policy or a consistent and widespread practice adopted by the City. Further, Plaintiff neither alleges that the Bantum prison officials have policymaking authority nor claims that the City failed to train and supervise its employees. Liberally construing the pleadings, Plaintiff seems to allege the existence of a practice adopted by the City solely based on Plaintiff's alleged experience. However, a "single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir.

1998) (quoting *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)). Without offering any factual support for his conclusory allegations, this Court cannot "infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557). Therefore, Plaintiff's claims against the City must be dismissed on this basis as well.

### D. Leave to Amend

In its motion to dismiss, the City requests that the Court deny Plaintiff any further leave to amend his pleading due to his repeated failure to cure the factual deficiencies. Doc. 45, at 8. Denying leave to amend is proper where the amendment would be futile or would result in undue prejudice to the opposing party. *Holmes v. Grubman*, 568 F.3d 329, 334–35 (2d Cir. 2009). An amendment is considered futile where the plaintiff is unable to demonstrate that he would be able to cure the defects in a manner that would survive a motion to dismiss. *Hayden v. Cnty. Of Nassau*, 180 F.3d 42, 53–54 (2d Cir. 1999).

Here, Plaintiff has been afforded two opportunities to amend his complaint pursuant to orders from this Court that contained specific instructions as to what he was required to plead for his claims to survive. Plaintiff failed to follow the directions contained in those orders. Given that Plaintiff's amended pleadings suffer from the same defects as his initial complaint, leave to file a third amended complaint would be futile. Therefore, the Amended and Second Amended Complaints will be dismissed with prejudice.

### V. CONCLUSION

For the reasons set forth above, the City's motion to dismiss Plaintiffs Amended Complaint and Second Amended Complaint is GRANTED. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Clerk of the Court is respectfully directed to terminate the motion, Doc. 44, to mail a copy of this Opinion and Order to Plaintiff, and to close the case.

It is SO ORDERED.

2017 WL 2703562

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2703562

---

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   6

KeyCite Red Flag - Severe Negative Treatment
Enforcement Denied by  Vides v. Searls,  W.D.N.Y.,  May 13, 2021

2020 WL 3969368
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Renen VIDES, Petitioner,

v.

Chad WOLF, in his official capacity as
Acting Secretary, U.S. Department of
Homeland Security, et al., Respondents.

6:20-CV-06293 EAW
|
Signed 07/14/2020

**Attorneys and Law Firms**

Katherine Buckel, Pro Hac Vice, The Legal Aid Society, Sharon Katz, Pro Hac Vice, Timothy E. Graulich, Luca E. Marzorati, Pro Hac Vice, Davis Polk & Wardwell LLP, New York, NY, for Petitioner.

Adam A. Khalil, U.S. Attorney's Office, Rochester, NY, United States Attorney's Office, Western District of New York, for Respondents.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, United States District Judge

**INTRODUCTION**

*1  Petitioner Renen Vides ("Petitioner"), an immigration detainee represented by counsel and currently detained at the Buffalo Federal Detention Facility ("BFDF"), seeks an emergency *writ of habeas corpus* pursuant to 28 U.S.C. § 2241. (Dkt. 1). Petitioner seeks immediate release, alleging that he faces imminent danger due to his potential exposure to COVID-19 while in custody, or, in the alternative, he seeks a bond hearing before an immigration judge. (*Id.* at 26-27). For the reasons discussed below, the Petition is granted in part and denied without prejudice in part.

**BACKGROUND**

**I. Petitioner's Factual Background**

The following facts are taken from the Petition, Respondents' Answer, and their supporting documents. Where the parties specifically controvert particular facts, the Court has noted the disagreement.

Petitioner was born on December 30, 1985, in Guatemala. (*Id.* at ¶ 15). When he was nine years old, his mother died, and he moved to Guatemala City to live with his father and stepmother. (*Id.* at ¶ 16). His father and stepmother beat him with braided electrical cords and forced him to perform domestic labor. (*Id.*). Petitioner ran away at 14, eventually living with his aunt and uncle. (*Id.*). In 2002, his cousin, whose parents Petitioner was living with, was shot and killed by narco-traffickers. (*Id.* at ¶ 17). The narco-traffickers began making threatening calls and visits to Petitioner's home, and Petitioner fled to the United States in 2003 with his entire immediate family. (*Id.* at ¶¶ 17-18). Petitioner entered the United States illegally, without admission or inspection, at an unknown time and place. (Dkt. 10 at ¶ 3). Shortly after arriving in New York, Petitioner met his partner with whom he had a son. (Dkt. 1 at ¶ 18).

In the United States, Petitioner was diagnosed with a seizure disorder and prescribed medication. (*Id.* at ¶ 19). Due to the infrequency of his seizures, and the expense and ineffectiveness of the medication, Petitioner stopped taking the medicine. (*Id.*). On their ten-year anniversary, Petitioner and his partner went to breakfast with their son, who was then four years old. (*Id.* at ¶ 20). Petitioner had a seizure while driving the car, and his partner and son were both killed. (*Id.*). On December 2, 2016, Petitioner pled guilty to two counts of manslaughter in the second degree, and was sentenced to five years probation. (*Id.* at ¶ 21; Dkt. 10 at ¶ 4; Dkt. 10-2 at 6).

A Warrant for Arrest of Alien was issued on October 3, 2018 (*id.* at ¶ 5), and on March 28, 2019, Petitioner was detained at the Bergen County Jail in Hackensack, New Jersey, and placed into removal proceedings. (Dkt. 1 at ¶ 22; Dkt. 10 at ¶¶ 5-6). Petitioner received a Notice of Custody Determination from the Department of Homeland Security ("DHS"), advising him that he would be detained pending an outcome in his removal proceedings. (Dkt. 10 at ¶ 8). On April 8, 2019, Petitioner appeared before an immigration judge ("IJ") for a removal hearing. (Dkt. 1 at ¶ 49; Dkt. 10 at ¶ 9). The IJ allowed an attorney to appear as a friend of the

Case 1:23-cv-00368-MAD-TWD    Document 9    Filed 06/20/23    Page 28 of 37

court and granted an adjournment until May 1, 2019, so that Petitioner could retain counsel. (Dkt. 1 at ¶ 49; Dkt. 10 at ¶ 9). At the May 1 hearing, the same attorney appeared on behalf of Petitioner and was served with the evidence in his case. (Dkt. 1 at ¶ 50; Dkt. 10 at ¶ 10). The hearing was again adjourned to June 17, 2019, to give Petitioner's counsel an opportunity to prepare. (Dkt. 1 at ¶ 50; Dkt. 10 at ¶ 10).

**\*2** At the June 17 hearing, Petitioner moved to suppress evidence in his removal hearing and to terminate the proceedings. Counsel for United States Immigration and Customs Enforcement ("ICE") requested two weeks to respond to the motion, and a hearing was set for July 22, 2019. (Dkt. 1 at ¶ 51; Dkt. 10 at ¶ 11). Both parties requested two-week adjournments, and the hearing was reset for August 5, 2019. (Dkt. 1 at ¶ 51; Dkt. 10 at ¶¶ 12-14). At the hearing, the IJ denied Petitioner's motions, Petitioner filed an I-589 application for asylum, withholding or removal, and relief under the Convention Against Torture based on his fear of return to Guatemala due to his cousin's murder and continued threats to his family. (Dkt. 1 at ¶ 51; Dkt. 10 at ¶ 15). His removal hearing was scheduled for September 5, 2019. (Dkt. 1 at ¶ 51; Dkt. 10 at ¶ 15).

On August 25, 2019, Petitioner contends that he was attacked by a detainee at the Bergen County Jail involved with the Mara Salvatrucha gang, commonly referred to as MS-13. (Dkt. 1 at ¶ 23). The detainee and other gang members had previously bullied Petitioner because of his seizure condition. (Dkt. 11-1 at ¶ 4). Petitioner also contends that gang members threatened to "jump" him and to send gang members in Guatemala to kill Petitioner if he was deported. (Dkt. 1 at ¶ 23). Respondents contend that Petitioner was involved in a fight, which caused another detainee to be sent to the hospital. (Dkt. 10 at ¶ 15). The encounter resulted in ten days of disciplinary segregation for Petitioner (*id.*; Dkt. 11-1 at ¶ 6), of which Petitioner only served one or two days (Dkt. 11-1 at ¶ 6). After the incident, Petitioner was moved to the Orange County Jail. (Dkt. 1 at ¶ 23).

Before the September 5, 2019, hearing, Petitioner's counsel filed a motion to produce so that Petitioner could be present for the proceedings, which the IJ initially denied. (*Id.* at ¶ 54). Petitioner's counsel moved for reconsideration at the September 5, 2019, hearing, citing concerns of using video teleconferencing in light of Petitioner's seizure condition. (Dkt. 1 at ¶ 54; Dkt. 10 at ¶ 17). The IJ granted the motion, and the hearing was scheduled for September 26, 2019, so Petitioner could appear in person. (Dkt. 1 at ¶ 54; Dkt. 10 at ¶

17). The hearing began on September 26, and was continued until October 17, 2019. (Dkt. 1 at ¶ 55; Dkt. 10 at ¶ 18). On November 20, 2019, the IJ issued a written decision ordering Petitioner removed from the United States. (Dkt. 1 at ¶ 56; Dkt. 10 at ¶ 20).

Petitioner appealed the decision to the Board of Immigration Appeals ("BIA") on December 18, 2019, and did not receive a transcript of the proceedings or briefing schedule from the BIA for almost three months. (Dkt. 1 at ¶¶ 57-58; Dkt. 10 at ¶ 21). On March 16, 2020, Petitioner was granted an extension of time within which to file his appellate brief, and his brief was filed on April 15, 2020. (Dkt. 1 at ¶ 58; Dkt. 10 at ¶ 21).

On March 12, 2020, Petitioner was transferred to the BFDF without his counsel receiving notification. (Dkt. 1 at ¶ 24; Dkt. 11-1 at ¶ 8). On April 3, 2020, Petitioner's counsel filed a request for release with ICE's New York City Field Office in light of the COVID-19 pandemic. (Dkt. 1 at ¶ 60). The New York City Field Office stated that it lacked jurisdiction over the request, and forwarded it to the Buffalo Field Office on April 14, 2020. (*Id.*). Petitioner's request was denied. (Dkt. 10 at ¶ 24). On April 28, 2020, ICE again reviewed Petitioner's medical and criminal history and determined that continued detention was warranted. (*Id.* at ¶¶ 22-23).

On June 2, 2020, the BIA dismissed Petitioner's appeal. (Dkt. 14-2). A petition for review was filed with the Second Circuit on June 30, 2020, Pet. for Review of Agency Order, *Vides v. Barr*, No. 20-2076, Dkt. 1 (2d Cir. June 30, 2020), and a motion for stay of removal was filed on July 2, 2020, Mot. for Stay of Removal, *Vides v. Barr*, No. 20-2076, Dkt. 8 (2d Cir. July 2, 2020). Petitioner remains detained at the BFDF. (Dkt. 1 at ¶ 3; Dkt. 10 at ¶ 28).

## II. COVID-19 and the BFDF

**\*3** COVID-19 has caused a global pandemic and public health emergency. According to the World Health Organization, as of July 14, 2020, there were 12,929,306 confirmed cases of COVID-19 worldwide, with 569,738 confirmed deaths and 216 countries, areas, or territories impacted. *See Coronavirus Disease (COVID-19) Pandemic*, World Health Org., https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited July 14, 2020). According to reports in the *New York Times*, as of the morning of July 14, 2020, the U.S. tallies include at least 3,379,900 people who have tested positive for the virus and at least 135,400 patients with the virus who have died. *See* Sarah Alkmukhtar, et al., *Coronavirus in the U.S.: Latest*

*Map and Case Count*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited July 14, 2020).

On March 7, 2020, Governor Andrew Cuomo declared a state of emergency for all of New York State related to COVID-19. *See* N.Y. Exec. Order No. 202 (Mar. 7, 2020), https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.pdf. The World Health Organization characterized COVID-19 a pandemic on March 11, 2020. *Coronavirus Disease 2019 (COVID-19) Situation Report 51*, World Health Org. (Mar. 11, 2020), https://www.who.int/docs/default-source/coronavirus/situation-reports/20200311-sitrep-51-covid-19.pdf?sfvrsn=1ba62e57_10. On March 13, 2020, President Donald Trump declared a national emergency. Proclamation No. 9994, 85 Fed. Reg. 15337 (Mar. 13, 2020).

To aid efforts to halt the spread of COVID-19, the Centers for Disease Control and Prevention (the "CDC") advise the public to engage in "social distancing," to limit community movement, and to cancel non-essential travel (including work travel). Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission, Ctrs. for Disease Control & Prevention (Mar. 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf.

Although much remains unknown about COVID-19, the available data indicates that it poses a greater risk to older individuals and individuals with underlying health conditions such as type 2 diabetes mellitus, chronic kidney disease, and obesity, and may pose a greater risk for individuals with asthma, cerebrovascular disease, and neurological conditions such as dementia. *See Coronavirus Disease 2019 (COVID-19): People Who Need to Take Extra Precautions*, Ctrs. for Disease Control & Prevention (July 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. There is also concern that correctional and detention facilities pose particular challenges in halting the spread of the virus. *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Ctrs.

for Disease Control & Prevention (May 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (discussing that correctional facilities present "unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors").

New York State has adopted extreme measures to address the COVID-19 pandemic. On March 20, 2020, Governor Cuomo signed the "New York State on PAUSE" Executive Order, which, among other things, mandated a 100% closure of non-essential businesses statewide and temporarily banned all non-essential gatherings of individuals of any size for any reason other than the provision of essential services. *New York State on PAUSE*, New York State, https://coronavirus.health.ny.gov/new-york-state-pause (last visited July 14, 2020). On May 15, 2020, the Finger Lakes Region, in which the BFDF is located, began Phase 1 of New York's four phase re-opening plan. *Phase 1 of Reopening Underway in Rochester*, WHEC (May 14, 2020, 9:22 AM), https://www.whec.com/news/phase-one-of-reopening-underway-in-rochester/5730419/. The Finger Lakes Region has steadily progressed through the phases, and entered Phase 4 on June 26, 2020. Randy Gorbman, *Finger Lakes "On Target" to Enter Phase 4 of Reopening on Friday*, WXXI News (June 23, 2020), https://www.wxxinews.org/post/finger-lakes-target-enter-phase-4-reopening-friday. As of July 14, 2020, Genesee County, the county housing the BFDF, has reported 250 cases of COVID-19 and 5 deaths. *Coronavirus in Our Community*, Rochester Regional Health, https://www.rochesterregional.org/coronavirus-covid19 (last visited July 14, 2020).

### III. **Petitioner's Conditions of Confinement**

**\*4** As previously discussed, Petitioner suffers from a seizure disorder. (Dkt. 1 at ¶ 45). He has had several seizures while in ICE custody, most recently on March 11, 2020, and April 6, 2020. (*Id.*). Petitioner contends that he has had these seizures despite taking his seizure medication daily (*id.*), while Respondents contend that he has a history of refusing to take his seizure medication (Dkt. 10-3 at ¶ 4). Additionally, Petitioner represents that he has a history of asthma (Dkt. 1 at ¶ 48), but Respondents contend his medical records do not support a diagnosis of asthma and that Petitioner denied a history of asthma during his initial medical intake (Dkt. 10-3 at 3). Petitioner also states that his access to medical care has become more limited since the spread of COVID-19 within BFDF. (Dkt. 1 at ¶ 44).

Petitioner is presently housed in a celled dormitory unit with another individual in his cell. (Dkt. 14-1 at ¶ 3). The cell has two beds and its own toilet and sink. (*Id.*). Petitioner maintains that he cannot be six feet apart from his cellmate, particularly because they share the toilet. (Dkt. 15-1 at ¶ 5). Petitioner shares two showers with 40 people. (Dkt. 1 at ¶ 44). Respondents contend that there is a schedule for shower times for each cell so that detainees may shower in isolation, and that detainees have access to cleaning supplies and disinfectant so that they may clean the showers and other surfaces before or after using them. (Dkt. 10-4 at ¶¶ 4, 8; Dkt. 14-1 at ¶ 5).

Detainees may eat their meals in their cells to facilitate social distancing. (Dkt. 10-4 at ¶ 5; Dkt. 14-1 at ¶ 6). All employees and staff wear masks when interacting with detainees, and masks are provided to detainees in their housing units. (Dkt. 10-4 at ¶ 7; Dkt. 14-1 at ¶ 7). Posters and signs are posted in multiple languages to advise of the dangers of COVID-19 and the importance of social distancing and other exposure mitigation techniques. (Dkt. 10-3 at ¶ 9; Dkt. 14-1 at ¶ 8).

As of April 28, 2020, there were 49 confirmed cases of COVID-19 in the BFDF. (Dkt. 1 at ¶ 43; Dkt. 14-1 at ¶ 10). However, no new known COVID-19 cases have emerged at the BFDF since April 21, 2020: over 150 tests have been performed since that date, all with negative results. (Dkt. 14-1 at ¶ 10). Additionally, all detainees may receive a COVID-19 test upon request. (*Id.* at ¶ 9). Both Petitioner and his roommate were tested on June 30, 2020, and their tests came back negative. (*Id.* at ¶ 12).

The BFDF has not been fully closed to the public because it houses the Batavia Immigration Court. (Dkt. 1 at ¶ 41). IJs, court personnel, facility personnel, attorneys, noncitizens' family members, and others continue to enter and exit BFDF daily. (*Id.*). The BFDF has implemented various procedures to address the continued foot traffic: the Government represented at oral argument that when new detainees first enter the facility, they are tested for COVID-19 and quarantined for 14 days, and that every person who comes onto BFDF property is temperature screened.

## IV. Procedural History
Petitioner filed the instant emergency Petition with this Court on May 5, 2020. (Dkt. 1). On June 2, 2020, Respondents filed their Answer and response (Dkt. 10), and Petitioner replied on June 8, 2020 (Dkt. 11). On June 20, 2020, Petitioner filed a supplemental letter informing the Court that the BIA had

issued its decision, and that Petitioner had filed a petition for review with the Second Circuit. (Dkt. 12). The Court ordered supplemental briefing (Dkt. 13), which Respondents submitted on July 7, 2020 (Dkt. 14), and Petitioner on July 10, 2020 (Dkt. 15). Oral argument was held telephonically before the undersigned on July 13, 2020. (Dkt. 13).

## DISCUSSION

### I. Legal Standard
The federal habeas corpus statute gives district courts jurisdiction to hear immigration-related detention cases. *See* 28 U.S.C. § 2241(c)(3); *Demore v. Kim*, 538 U.S. 510, 517-18 (2003) (holding federal courts have jurisdiction to review challenges to pre-removal detention); *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001) (holding "§ 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention" in immigration cases). District courts do not have jurisdiction over challenges to the legality of final orders of deportation, exclusion, and removal; jurisdiction to review such challenges rests exclusively in circuit courts. *See Gittens v. Menifee*, 428 F.3d 382, 384 (2d Cir. 2005) ("[The REAL ID Act, 119 Stat. 231, § 106(a) (May 11, 2005) ] eliminates habeas jurisdiction over final orders of deportation, exclusion, and removal, providing instead for petitions of review ... which circuit courts alone can consider.").

**\*5** "When a petitioner brings a habeas petition pursuant to § 2241, the petitioner 'bears the burden of proving that he is being held contrary to law; and because the habeas proceeding is civil in nature, the petitioner must satisfy his burden of proof by a preponderance of the evidence.' " *Dzhabrailov v. Decker*, No. 20-CV-3118 (PMH), 2020 WL 2731966, at \*3 (S.D.N.Y. May 26, 2020) (quoting *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011)); *see Cruz v. Decker*, No. 18-CV-9948 (GBD) (OTW), 2019 WL 7572975, at \*3 (S.D.N.Y. Aug. 27, 2019) ("To obtain [ ] relief [under § 2241], the petitioner must show violation of his rights by a preponderance of the evidence." (citing *Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997))), *report and recommendation adopted*, 2019 WL 6318627 (S.D.N.Y. Nov. 26, 2019).

### II. Named Respondents
As a preliminary matter, the Government contends that Jeffrey J. Searls, Officer in Charge of the Buffalo Federal Detention Facility, is the only respondent with immediate

custody over Petitioner, and consequently the only proper respondent. (Dkt. 10-6 at 15). The Court agrees with the Government and dismisses all respondents except for Jeffrey Searls from the instant action. *See Rodriguez v. Barr*, No. 6:18-cv-06757-MAT, 2019 WL 2192516, at *3 n.3 (W.D.N.Y. May 21, 2019) ("Searls is the only proper respondent in this § 2241 proceeding as he is the person with direct control over Petitioner's detention." (citing *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) ("[I]n habeas challenges to present physical confinement ... the default rule is that the proper respondent is the warden of the facility where the prisoner is being held[.]")); *Hassoun v. Sessions*, No. 18-CV-586-FPG, 2019 WL 78984, at *7 (W.D.N.Y. Jan. 2, 2019) ("The majority view in the Second Circuit requires the 'immediate custodian,' generally the prison warden, to be named as a respondent in 'core' immigration habeas proceedings—*i.e.*, those challenging present physical confinement." (quotation omitted)); *see also S.N.C. v. Sessions*, 325 F. Supp. 3d 401, 407 (S.D.N.Y. 2018) ("If, on the other hand, the petition challenges a broader form of legal, non-physical custody, then the proper respondent is the person with legal authority to effect that custody.").

### III. Procedural Due Process

Petitioner argues that his continued detention without a bond hearing is a violation of his procedural due process rights. For the following reasons, the Court finds that Petitioner is entitled to a bond hearing where the Government bears the burden of proving by clear and convincing evidence that Petitioner poses either a danger to the community or a risk of flight.

#### A. Statutory Provision of Detention

As a preliminary matter, the Court must determine which statutory provision Petitioner is presently detained under. Respondent contends that Petitioner is currently detained pursuant to 8 U.S.C. § 1231. (Dkt. 14). Petitioner maintains that he is currently detained pursuant to 8 U.S.C. § 1226(c). [1] (Dkt. 15).

[1]   Respondent previously represented that Petitioner was initially detained pursuant to 8 U.S.C. § 1226(a). (Dkt. 10-6 at 11). However, at oral argument both parties agreed that prior to the BIA's denial of Petitioner's appeal, Petitioner was detained pursuant to § 1226(c).

"The distinction between § 1226 and § 1231 essentially comes down to whether an alien is subject to a final order of removal." *Enoh v. Sessions*, 236 F. Supp. 3d 787, 793 (W.D.N.Y. 2017), *appeal withdrawn*, No. 17-1236, 2017 WL 6947858 (2d Cir. Dec. 7, 2017). Section 1231 of the INA addresses detention of "immigrants in the 'removal period,' the term used in the statute to describe the 90-day period following an order of removal during which 'the Attorney General shall remove the alien.' " *Hechavarria v. Sessions*, 891 F.3d 49, 54 (2d Cir. 2018) (quoting 8 U.S.C. § 1231(a)(1)(A)). The removal period begins "on the latest of the following": (1) "[t]he date the order of removal becomes administratively final"; (2) "[i]f the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order"; and (3) "[i]f the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement." 8 U.S.C. § 1231(a)(1)(B).

**\*6** In 2012, DHS and the Second Circuit entered into a forbearance agreement wherein the Government "has assured that removal will not occur" while the detainee has a petition for review pending before the Second Circuit. *In re Immigration Petitions for Review Pending in U.S. Court of Appeals for Second Circuit*, 702 F.3d 160, 162 (2d Cir. 2012). The overwhelming majority of courts in this Circuit have found that the forbearance agreement amounts to a "court order[ed] stay of the removal of the alien" and that detainees with a pending petition for review and motion to stay are not detained pursuant to § 1231. *See Sankara v. Whitaker*, No. 18-CV-1066, 2019 WL 266462, at *4 (W.D.N.Y. Jan. 18, 2019) (collecting cases); *see, e.g.*, *Yusuf v. Edwards*, No. 18-CV-3605 (GBD) (BCM), 2019 WL 4198798, at *5 & n.4 (S.D.N.Y. July 2, 2019) ("[B]ecause of the government's forbearance policy, an alien who files a PFR and a stay motion in the Second Circuit obtains 'the functional equivalent of a stay order,' such that § 1231 no longer governs his detention and he 'may not be denied a bond hearing on that basis.' " (collecting S.D.N.Y. cases)). For the reasons that this Court previously articulated in *Ranchinskiy v. Barr*, 422 F. Supp. 3d 789, 795-96 (W.D.N.Y. 2019), including based upon the Second Circuit's reasoning in *Hechavarria*, it agrees that § 1231 does not apply here.

Respondent contends that reliance on the Second Circuit's decision in *Hechavarria* is misplaced because the Second Circuit did not reach the issue of the forbearance agreement. (Dkt. 14 at 3). It is true that in *Hechavarria*, the Circuit had granted the petitioner's stay of removal while his petition

for review was pending. *Id.* at 57. However, in the decision the Circuit held the petitioner was detained under § 1226(c) because "there remains a very clear impediment to his removal—review by this Court" and reasoned that "[g]iven the fact that such review has not been completed, it would make no sense to classify [the petitioner] in the same section of the statute that governs the removal of aliens who have no remaining barriers preventing their immediate removal." *Id.* Based on that same reasoning, courts have concluded that "the forbearance agreement amounts to a 'court order[ed] stay of the removal of the alien.' " *Sankara*, 2019 WL 266462, at \*4 (alteration in original) (quoting *Hechavarria*, 891 F.3d at 49); *see Ranchinskiy*, 422 F. Supp. 3d at 795-96; *see also Yusuf*, 2019 WL 4198798, at \*5 & n.4; *Alexander v. Decker*, No. 17 Civ. 5706 (GBD) (KHP), 2019 WL 1407353, at \*5-6 (S.D.N.Y. Mar. 28, 2019) ("[T]he Second Circuit's forbearance policy is an insurmountable substantive impediment to Petitioner's removal until that Court issues a decision on his motion to stay."). *But see Narain v. Searls*, No. 19-CV-6361 (CJS), 2020 WL 95425, at \*3-4 (W.D.N.Y. Jan. 8, 2020) (finding petitioner was detained pursuant to § 1231); *Nunez v. Searls*, No. 18-CV-6463 CJS, 2019 WL 2524308, at \*2-3 (W.D.N.Y. June 19, 2019) (same), *appeal dismissed*, No. 19-2114 (2d Cir. June 26, 2020).

Respondent argues that the forbearance agreement differs from a stay because pursuant to the forbearance agreement, the Government may engage in removal after providing a 21-day notice to the Circuit, whereas if a stay has been ordered removal cannot occur until the Second Circuit decides the petition for review or vacates the stay. (Dkt. 14 at 4-5). The Court is not persuaded by this distinction. First, the Government has not filed a notice of intent to remove in Petitioner's case, so the forbearance agreement remains an impediment to removal. Second, even with the 21-day notice provision, the forbearance agreement still amounts to an impediment to removal just like a formal stay—albeit an impediment with arguably a shorter life span *if* the government takes the necessary steps to serve the requisite notice. In other words, the 21-day notice requirement is also a "barrier[ ] preventing ... immediate removal," *Hechavarria*, 891 F.3d at 57, and the forbearance agreement effectively constitutes a consent order staying removal, which nonetheless can be lifted if the requisite notice is served and 21 days elapses without entry of a temporary or formal stay. The practical impact of the forbearance agreement is illustrated by a case cited by Respondent wherein the Second Circuit granted a temporary stay two days after receiving the

Government's notice of intent to remove. *See Yusuf*, 2019 WL 4198798, at \*3.

**\*7** For all these reasons, the Court finds that § 1231 does not apply, and Petitioner is presently detained pursuant to § 1226(c).

### B. **Petitioner Is Entitled to a Bond Hearing**

For the reasons previously articulated in other decisions by this Court, *see, e.g.*, *Ranchinskiy*, 422 F. Supp. 3d at 797; *Constant v. Barr*, 409 F. Supp. 3d 159, 167-68 (W.D.N.Y. 2019), this Court agrees with the overwhelming majority of courts in this Circuit that the multi-factor approach articulated by the court in *Sajous v. Decker*, No. 18-CV-2447 (AJN), 2018 WL 2357266, at \*1 (S.D.N.Y. May 23, 2018), *appeal withdrawn*, No. 18-2591, 2019 WL 4137822 (2d Cir. May 7, 2019), and other courts within this Circuit, is a useful tool for addressing procedural due process claims for aliens detained pursuant to § 1226(c) in the immigrant habeas context. Those non-inclusive factors are as follows:

> (1) the length of time the petitioner has been detained; (2) the party responsible for the delay; (3) whether the petitioner has asserted defenses to removal; (4) whether the detention will exceed the time the petitioner spent in prison for the crime that made him removable; (5) whether the detention facility is meaningfully different from a penal institution for criminal detention; (6) the nature of the crimes committed by the petitioner; and (7) whether the petitioner's detention is near conclusion.

*Cabral v. Decker*, 331 F. Supp. 3d 255, 261.

As to the first factor, Petitioner has been detained in immigration custody since March 28, 2019. Thus, "[t]he first and 'most important' ... factor weighs heavily in favor of granting the petition." *Bermudez Paiz v. Decker*, No. 18-CV-4759 (GHW) (BCM), 2018 WL 6928794, at \*13 (S.D.N.Y. Dec. 27, 2018) (citation omitted). "[C]ourts in this Circuit have generally been skeptical of prolonged detention of removable immigrants, without process, lasting

over six months," *Lett v. Decker*, 346 F. Supp. 3d 379, 387 (S.D.N.Y. 2018) (quoting *Lopez v. Sessions*, No. 18 Civ. 4189 (RWS), 2018 WL 2932726, at *14 (S.D.N.Y. June 12, 2018)), *appeal filed*, No. 18-3714 (2d Cir. Dec. 11, 2018), and "courts have found detention shorter than a year to be unreasonably prolonged as part of procedural due process analysis," *Rosado Valerio v. Barr*, No. 19-CV-519, 2019 WL 3017412, at *4 (W.D.N.Y. July 10, 2019) (collecting cases), *appeal dismissed*, No. 19-2848, 2020 WL 1126526 (2d Cir. Jan. 9, 2020).

The record before the Court shows that Petitioner has been detained for roughly 16 months without meaningful process. Petitioner received an initial custody determination in March 2019 and he requested an IJ to review the determination but never received such review. (Dkt. 10-2 at 19). Additionally, ICE reviewed Petitioner's detention in April 2020, but found that Petitioner "ha[d] not established to ICE's satisfaction that [he] is not a flight risk" or "danger to the community." The April 2020 custody determination makes clear that the burden of proof was on Petitioner to prove he is not a flight risk or danger to the community, and as discussed below, the Court finds that due process requires the Government to bear this burden. Consequently, the first factor weighs heavily in Petitioner's favor. *See, e.g.*, *Bermudez Paiz*, 2018 WL 6928794, at *30 (first factor weighed heavily in petitioner's favor where petitioner had been detained for more than 16 months since his parole had been revoked); *Joseph v. Decker*, No. 18-CV-2640(RA), 2018 WL 6070567, at *11 (S.D.N.Y. Nov. 21, 2018) (first factor weighed in petitioner's favor where petitioner had been detained for over 14 months).

**\*8** Respondent contends that the second factor in the analysis—which party is responsible for the delay— undercuts a finding of an unreasonable length of detention in Petitioner's case because "Petitioner's detention is due to his own actions." (Dkt. 10-6 at 12). For procedural due process claims, when "considering whether [Petitioner] or the Government is responsible for the prolonged proceedings, the Court 'may examine the record to determine whether the alien sought repeated or unnecessary continuances, or filed frivolous claims and appeals.' " *Vallejo v. Decker*, No. 18-CV-5649, 2018 WL 3738947, at *4 (S.D.N.Y. Aug. 7, 2018) (quoting *Sopo v. U.S. Att'y Gen.*, 825 F.3d 1199, 1218 (11th Cir. 2016), *vacated on other grounds*, 890 F.3d 952 (11th Cir. 2018)); *see Sajous*, 2018 WL 2357266, at *11 ("[A]liens who are merely gaming the system to delay their removal should not be rewarded with a bond hearing that they would not otherwise get under the statute." (quoting *Chavez-*

*Alvarez v. Warden York Cty. Prison*, 783 F.3d 469, 476 (3d Cir. 2015))). "[C]ourts should keep in mind that 'aliens should not be punished for pursuing avenues of relief and appeals[,]' but evidence of bad faith delays may cut against them." *Hernandez v. Decker*, No. 18-CV-5026 (ALC), 2018 WL 3579108, at *7 (S.D.N.Y. July 25, 2018) (quotation omitted), *appeal withdrawn*, No. 18-2824, 2019 WL 1377025 (2d Cir. Feb. 5, 2019).

Here, a significant portion of the delay between April 2019 (when Petitioner requested a continuance to seek counsel) and September 2019 (when the merits hearing before the IJ began), can be attributed to requests for adjournment made by Petitioner. However, the record does not show that Petitioner was engaging in bad faith delay tactics. To the contrary, Petitioner's requests for continuances were made to obtain counsel, for counsel to prepare for the merits hearing, and for Petitioner to appear in person for his merits hearing instead of via videoconference due to concerns regarding his seizure disorder. (Dkt. 1 at ¶¶ 49-54; Dkt. 10 at ¶¶ 9-17). Further, the record indicates that the proceedings were then adjourned multiple times due to the pending adjudication of the motion to suppress evidence and of Petitioner's I-589 application for asylum, withholding of removal, and relief under the Convention Against Torture. (Dkt. 1 at ¶¶ 49-54; Dkt. 10 at ¶¶ 9-17). As such, it would not be appropriate to utilize these requests for adjournment to penalize Petitioner. *See, e.g.*, *Sopo*, 825 F.3d at 1218; *Vallejo*, 2018 WL 3738947, at *4; *Hernandez*, 2018 WL 3579108, at *7; *Sajous*, 2018 WL 2357266, at *11. On the other hand, it is apparent that Petitioner's continued detention and stay of removal has been triggered by the pending appeal, although the Court cannot state that Petitioner's appeal is frivolous or in bad faith. *See Hechavarria*, 891 F.3d at 56 n.6 (noting the Supreme Court has given weight to a petitioner's decision to pursue review of a removal order in the "context only of an immigrant who has 'substantially prolonged his stay by abusing the processes provided to him,' *Nken v. Holder*, 556 U.S. 418, 436 (2009)— not of an immigrant who simply made use of the statutorily permitted appeals process"). Thus, while much of the delay rests with Petitioner's litigation strategy, the Court cannot conclude that that strategy has been employed for purposes of creating delay.

As for the third factor, Petitioner has asserted defenses to removal in his immigration proceedings. He has asked for relief under the CAT, has applied for asylum, and contends that the IJ improperly did not require DHS to authenticate evidence at the merits hearing and did not properly consider

the evidence presented by Petitioner. (Dkt. 1 at 19). "The Court need not inquire into the strength of [Petitioner's] defenses—it is sufficient to note their existence and the resulting possibility that the Petitioner will ultimately not be removed, which diminishes the ultimate purpose of detaining the Petitioner pending a final determination as to whether he is removable." *Sajous*, 2018 WL 2357266, at *11; *see Cabral*, 331 F. Supp. 3d at 261-62 (finding the third factor weighed in petitioner's favor because he asserted several defenses to his removal "including asylum ... and relief under the Convention Against Torture"); *Perez v. Decker*, No. 18-CV-5279 (VEC), 2018 WL 3991497, at *5 (S.D.N.Y. Aug. 20, 2018) ("Petitioner has made a claim for asylum that could be a defense to his removal, again tilting the scales toward his unreviewed detention being unreasonable."). Accordingly, this factor weighs in Petitioner's favor.

**\*9** The fourth factor also weighs in Petitioner's favor. His detention has been significantly longer than the time that he spent in prison for the crime that made him removable—Petitioner was not sentenced to any time in prison as a result of his convictions. (Dkt. 10 at ¶ 4; Dkt. 10-2 at 6).

The fifth factor—whether the detention facility is meaningfully different from a penal institution for criminal detention—is at best neutral. Respondent has submitted a declaration describing the conditions of confinement at the BFDF as not consisting of "the same level of restrictions typical for someone held at a prison." (Dkt. 11-7 at ¶ 7). However, even with the amenities, such as entertainment and "arts & crafts," detailed in that declaration (*id.* at ¶¶ 6-7), the reality is that the facility houses individuals against their will with various restrictions on their freedom of movement. Indeed, Respondent's declaration also notes that the BFDF is required to comply with the <u>Prison</u> Rape Elimination Act. (*Id.* at ¶ 12). Thus, while perhaps not akin to a maximum-security prison, for many individuals, even crediting the description set forth in the declaration, the facility does not seem meaningfully different from at least a low-security penal institution for criminal detention.

The sixth factor, the nature of the crime Petitioner was convicted of, weighs against Petitioner on its face, but the underlying facts are certainly unique. In December 2016, Petitioner pleaded guilty to a violent crime—manslaughter in the second degree. *See Constant*, 409 F. Supp. 3d at 171 (finding sixth factor weighed against the petitioner where he had pleaded guilty to committing the violent crimes of manslaughter and attempted assault, as well as trafficking

firearms). However, the Court notes that while past criminal convictions, particularly of violent offenses, are critical to evaluating a petitioner's risk of danger to the community, "[t]he process due even to excludable aliens requires an opportunity for evaluation of the individual's *current* threat to the community and his risk of flight." *Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 240 (W.D.N.Y. 2019) (quoting *Chi Thon Ngo v. I.N.S.*, 192 F.3d 390, 398 (3d Cir. 1999)). Moreover, the conviction in this case represents no ordinary manslaughter conviction, given the underlying tragic facts and circumstances. Also, there is no evidence in the record showing that Petitioner poses a current threat to the community—indeed, he was sentenced to no incarceration for the manslaughter conviction. Thus, on the whole, the Court considers this factor as neutral.

The final factor, whether Petitioner's detention is near conclusion, arguably weighs in Petitioner's favor. The merits of Petitioner's petition for review have not yet been briefed before the Second Circuit, and it is unclear when the Second Circuit will issue its decision. *See Dukuray v. Decker*, No. 18 CV 2898 (VB), 2018 WL 5292130, at *5 (S.D.N.Y. Oct. 25, 2018) ("[T]here is 'significant reason to believe that [petitioner's detention] will continue ... because ... he would remain detained throughout the course of an appeal by either side.' " (second alteration in original) (quoting *Lett*, 346 F. Supp. 3d at 387)).

Thus, on balance and particularly in view of the length of the detention and the circumstances surrounding that detention, the Court finds that Petitioner's continued detention without a bond hearing is constitutionally unjustified. *See Arce-Ipanaque v. Decker*, No. 19-CV-1076 (JMF), 2019 WL 2136727, at *2 (S.D.N.Y. May 15, 2019) ("At bottom, the minimal burden that a bond hearing would place on the Government is far outweighed by [the petitioner]'s interest in ensuring that his continued detention is justified." (quotation and original alteration omitted)).

**\*10** Taking all of the above into consideration, the Court finds "the 'minimal burden' that a bond hearing would place on the Government is far outweighed by [Petitioner]'s interest in 'ensur[ing] that his continued detention is justified,' " *Arce-Ipanaque*, 2019 WL 2136727, at *2 (quoting *Vallejo*, 2018 WL 3738947, at *5), and due process requires that Petitioner receive a bond hearing where the government must demonstrate dangerousness or flight risk by clear and convincing evidence. Additionally, the Court finds that both due process and BIA precedent require the IJ to consider

Case 1:23-cv-00368-MAD-TWD   Document 9   Filed 06/20/23   Page 35 of 37

ability to pay and alternative conditions of release in setting bond. *See Abdi v. Nielsen*, 287 F. Supp. 3d 327, 335-39 (W.D.N.Y. 2018); *see also Hernandez v. Sessions*, 872 F.3d 976, 991 & n.4 (9th Cir. 2017) ("A bond determination that does not include consideration of financial circumstances and alternative release conditions is unlikely to result in a bond amount that is reasonably related to the government's legitimate interests."); *Arce-Ipanaque*, 2019 WL 2136727, at *3 (collecting cases); *Lett*, 346 F. Supp. 3d at 389 ("The Court agrees with Petitioner that an immigration bond hearing that fails to consider ability to pay or alternative conditions of release is constitutionally inadequate."); *Hernandez*, 2018 WL 3579108, at *12 ("[T]he Due Process Clause requires than an IJ consider ability to pay and alternative conditions of release in setting bond." (quotation and alteration omitted)).

## IV. Substantive Due Process

Petitioner also claims that he is being held in unsafe conditions in violation of his Fifth Amendment right to substantive due process. "In order to establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was so 'egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). "Immigration detainees can establish a due process violation for unconstitutional conditions of confinement by showing that a government official 'knew, or should have known' of a condition that 'posed an excessive risk to health,' and failed to take appropriate action." *Basank v. Decker*, ––– F. Supp. 3d ––––, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *5 (S.D.N.Y. Mar. 26, 2020) (quoting *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017)); *see also Coronel v. Decker*, ––– F. Supp. 3d ––––, No. 20-CV-2472 (AJN), 2020 WL 1487274, at *3 (S.D.N.Y. Mar. 27, 2020) ("The Due Process Clause ... prohibits the federal government from being deliberately indifferent to the medical needs of civil detainees."). As the *Coronel* court explained:

> [A] petitioner establishes a claim for deliberate indifference by proving that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the

pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.

2020 WL 1487274, at *4 (quotation and original alteration omitted).

Petitioner claims that his medical conditions place him at high risk from COVID-19, and that the conditions at the BFDF are sufficiently serious as to pose a substantial risk of serious harm to him. Respondent contends that Petitioner does not suffer from medical conditions that make him high risk, and that the steps taken by Respondent to prevent the spread of COVID-19 do not demonstrate deliberate indifference. (Dkt. 10-6 at 6-10). The Court finds that Petitioner has failed to meet his burden of showing that he suffers from medical conditions that make him vulnerable in the event that he contracts COVID-19 and as a result has failed at this time to demonstrate that he has a serious medical need.

Courts in this Circuit have overwhelmingly, if not exclusively, found that immigration detainees who suffer from medical conditions that put them at high risk if infected with COVID-19 have a serious medical need for purposes of the deliberate indifference analysis. *See, e.g., Jones*, 2020 WL 1643857, at *7-8; *Basank*, 2020 WL 1481503, at *3; *Coronel*, 2020 WL 1487274, at *5. The parties dispute several key aspects of Petitioner's claimed underlying medical conditions: (1) whether Petitioner's asthma, if he suffers from it, is severe enough to make him high-risk if infected with COVID-19; and (2) whether Petitioner's seizure disorder places him at a higher risk.

**\*11** The Court finds Petitioner has not demonstrated by a preponderance of the evidence that either of his alleged conditions makes him a vulnerable individual in the context of COVID-19. Petitioner primarily relies on a four page, unsworn, unsigned document purportedly written by Laura S. Boylan, M.D., wherein Dr. Boylan represents that her review of Petitioner's medical records shows that Petitioner "had pre-existing asthma and was on inhalers prior to the accident," as well as opines that Petitioner's seizure disorder places him at higher risk of complications from COVID-19. (Dkt. 11-4 at 3-4). However, as noted, this statement from Dr. Boylan is unsworn and unsigned, and Petitioner has not submitted any medical records to substantiate his claims. In contrast, Respondent has a provided a sworn declaration by

Captain Carlos Quinones, M.D., who states that Petitioner's medical records do not support a history of asthma. (Dkt. 10-3 at ¶ 7). Respondent also points to CDC guidance which lists only moderate to severe asthma as placing individuals at higher risk from COVID-19, and does not recognize seizures or epilepsy as making an individual more susceptible to the disease. (Dkt. 10-6 at 9); *see Coronavirus Disease 2019 (COVID-19): People Who Need to Take Extra Precautions*, Ctrs. for Disease Control & Prevention (July 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

The Court finds that the document from Dr. Boylan to be an insufficient basis from which the Court can determine whether Petitioner's seizure disorder makes him a vulnerable individual. Again, the document is unsworn and unsigned. *See Estate of Keenan v. Hoffman-Rosenfeld*, No. 16CV0149SFJAYS, 2019 WL 3410006, at *17 (E.D.N.Y. July 29, 2019) ("[T]here is no notary jurat indicating that Dr. Peyster swore to or affirmed the truthfulness of his declarations. Therefore, the Court need not consider it."); *Jay v. Glob. Foundries U.S. Inc.*, No. 5:15-CV-1066, 2018 WL 1441297, at *3 (N.D.N.Y. Mar. 22, 2018) ("[D]efendant's unsworn expert report will not be considered."), *aff'd*, 758 F. App'x 209 (2d Cir. 2019). Additionally, the document contains no citations to scientific studies that support Dr. Boylan's contentions. This lack of support is particularly fatal in the present context where there does not appear to be a scientific consensus as to whether a seizure disorder makes an individual prone to serious complications from COVID-19. For example, the Epilepsy Foundation has represented that epilepsy alone "[d]oes not increase the risk of getting COVID-19" and "[d]oes not increase the severity of COVID-19," *COVID-19 and Epilepsy*, Epilepsy Foundation of Am., https://www.epilepsy.com/learn/covid-19-and-epilepsy (last visited July 11, 2020), and the CDC has not listed seizures as a condition that makes an individual high risk. Courts that have found that petitioners suffer from a serious medical need for purposes of the deliberate indifference analysis in the context of the COVID-19 pandemic have done so only for detainees suffering from conditions recognized by the CDC as placing individuals at higher risk. *See, e.g.*, *Ramsundar v. Wolf*, No. 20-CV-361, 2020 WL 1986923, at *2 (W.D.N.Y. Apr. 27, 2020) ("Because petitioners ... did not meet the CDC criteria for COVID-19 vulnerability, the Court found that the respondents were not acting with deliberate indifference to their medical needs and consequently denied their motions."), *amended*, No. 20-CV-361, 2020 WL 2557832

(W.D.N.Y. May 20, 2020); *Basank*, 2020 WL 1481503, at *3 (identifying health and safety risks posed by COVID-19 based on CDC guidance); *Coronel*, 2020 WL 1487274, at *5 (finding the petitioners, who had major organs partially removed, type 2 diabetes, obesity, and hypertension, were "particularly vulnerable to severe illness or death if infected by COVID-19").

Petitioner argues that the CDC has identified neurological conditions as placing individuals at higher risk. (Dkt. 1 at ¶ 27). However, the most recent CDC guidance identifies "neurological conditions such as *dementia*" as potentially placing individuals at higher risk, and does not mention seizure disorders. *See Coronavirus Disease 2019 (COVID-19): People Who Need to Take Extra Precautions*, Ctrs. for Disease Control & Prevention (July 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (emphasis added). Nor has Petitioner produced anything that demonstrates a relevant connection between dementia and seizures, particularly as it relates to COVID-19. Such tenuous support is not sufficient to meet Petitioner's burden in the instant matter.

**\*12** Moreover the Court cannot find on the record before it that Petitioner has demonstrated by a preponderance of the evidence that his alleged asthma makes him a vulnerable individual. Even if Petitioner's medical record, which is not presently before the Court, does indicate that Petitioner "had pre-existing asthma and was on inhalers prior to the accident" (Dkt. 11-4 at 3-4), and the Court fully credits Petitioner's declaration where he states that he has "a history of asthma," was "first diagnosed with asthma as a teenager and was prescribed inhalers for a number of years" (Dkt. 11-1 at ¶ 2), this evidence does not show that Petitioner presently suffers from asthma, or that any such asthma rises to the level in the CDC guidance of moderate or severe.

Accordingly, the Court finds that Petitioner has not established based on the present record that he is a vulnerable individual and denies his substantive due process claim. This does not mean that Petitioner cannot show that he is a vulnerable individual—it is entirely possible that Petitioner could present more substantial evidence that his seizure disorder places him at high risk from a COVID-19 infection or that he presently suffers from moderate to severe asthma. Therefore, the denial of this portion of the Petition is without prejudice.

### <u>CONCLUSION</u>

For the foregoing reasons, the Petition (Dkt. 1) is granted in part to the extent that the Court orders Respondent to afford Petitioner an individualized bond hearing consistent with the procedures outlined in this Decision and Order within 14 days of its entry. If Petitioner requests a continuance that results in a bond hearing date outside the 14-day deadline set forth above, such a continuance will be in compliance with the instant Decision and Order, as long as the new date falls within a reasonable time period. Respondent is directed to file a status update with the Court within three (3) days of the date of Petitioner's bond hearing regarding the outcome of the hearing, or on or before July 31, 2020, whichever date is earlier. The Court denies Petitioner's substantive due process claim without prejudice. The Clerk of Court is directed to enter judgment and close this case.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 3969368

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.